## Milk Control Commission, Appellant, *v.* Battista.

Argued January 7, 1964. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Anthony W. Novasitis, Jr.,* Assistant Attorney Gen-
eral, with him *William D. Morgan,* Assistant Attorney
General, and *Walter E. Alessandroni,* Attorney Gen-
eral, for Milk Control Commission, appellant.

*J. Brooke Aker,* for appellees.

OPINION BY MR. JUSTICE ROBERTS, March 24, 1964:

The Pennsylvania Milk Control Commission filed
a complaint in equity in the Court of Common Pleas
of Montgomery County to enjoin appellees, trading as
Nor-View Farm, from selling milk which had been re-
moved from the farm prior to sale to consumers at less

than minimum prices established by the commission.[1]
At the time the action was filed, the named defendants
were not licensed by the commission, nor was any ap-
plication for a license pending. The milk sold origi-
nated on Nor-View Farm from appellees' own herd.
Not having their own processing plant, appellees re-
moved the milk in its bulk state to a nearby dairy,
where it was pasteurized, homogenized, bottled, and re-
turned to appellees' farm for sale.

By preliminary objections, appellees asserted that
they were exempt from the licensing and pricing provi-
sions of the Milk Control Law, April 28, 1937, P. L.
417, as amended, 31 P.S. §§700j-101—700j-1302 (Supp.
1963). Section 402 (31 P.S. §700j-402 (Supp. 1963)),
under which the exemption is claimed, declares: "The
commission may, by official order, exempt from the li-
cense requirements provided by this act milk dealers
or handlers . . . . However, milk dealers or handlers
exempted by this section from the license requirements
of this act shall continue to be subject to all the other
provisions of this act relating to milk dealers or han-
dlers: Provided, however, That in cash sales of milk,
to consumers in containers owned and provided by the
consumer, if he shall have produced all the milk on the
farm where sold *and such milk has at no time left the
producer's farm prior to its sale to the consumer* and
he shall have neither purchased nor received milk from
other producers or handlers and his total sales to con-
sumers do not exceed two gallons to any one consumer
in any one day, the producer so selling milk shall be
exempt from the provisions of this act." (Emphasis
supplied.)[2]

---

[1] The injunction was sought pursuant to §1004 of the Milk
Control Law, April 28, 1937, P. L. 417, 31 P.S. §700j-1004.

[2] Section 402 covers what the industry calls "jugged milk" op-
erations. There are 58 operations in Pennsylvania where the pro-
ducer pasteurizes his own milk, and there are approximately 175

Appellees' argument involves two phases. First, they contend that the requirement that milk remain on the producer's farm prior to sale to customers (italicized in the quotation above) is unreasonable, arbitrary, discriminatory, capricious and beyond the scope of the legislative purpose. More specifically, they urge that it is violative of the due process clause of the Fourteenth Amendment to the Constitution of the United States, Article I, §§1 and 9 of the Pennsylvania Constitution, and Article III, §7 of the Pennsylvania Constitution which prohibits special legislation. Second, they urge that so construed, the clear language of §402 exempts their operation from regulation under the Milk Control Law.

The parties stipulated that "the only issue involved in the present controversy is the right of defendants to sell milk at unregulated prices where such milk is processed off the farm where produced and sold."[3]

The court below sustained the preliminary objections, holding that ". . . there appears to be no rational basis for the distinction whereby an exemption is granted in cases where the farmer pasteurizes his milk on his own farm and denied where he takes his milk elsewhere for pasteurizing and returns the milk to his farm for sale." In support of this conclusion, the court cited *Milk Control Commission v. Stocker,* 36 Northhampton Rep. 237 (1962), in which the same result was reached. This appeal by the Commonwealth followed.

In *Nebbia v. New York,* 291 U.S. 502, 538 (1934), the United States Supreme Court, sustaining state regulation of milk and of retail prices, noted: "If the

which sell raw milk, but both groups sell at unregulated prices below those set by the Commission.

[3] As a consequence of this stipulation, the fact that the milk was sold in containers other than those provided by the consumer is not material to the disposition of this case.

law-making body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixed prices reasonably deemed by the legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other."

Prior decisions of this Court have sustained the constitutionality of the Pennsylvania Milk Control Acts and have held that licensing and price fixing in this area are valid exercises of the police power of the Commonwealth. *Colteryahn Sanitary Dairy v. Milk Control Commission*, 332 Pa. 15, 1 A. 2d 775 (1938); *Rohrer v. Milk Control Board*, 322 Pa. 257, 186 Atl. 336 (1936).

Neither the United States Constitution nor the Constitution of Pennsylvania prohibit economic classification or regulation by the Legislature if the statutory classification of subjects is based upon valid distinction. *Sablosky v. Messner*, 372 Pa. 47, 92 A. 2d 411 (1952).

The effectiveness of the Pennsylvania Milk Control Law is based primarily on its price fixing authority. Without control of price and related regulatory provisions, its broad objectives, including maximum sharing of surplus and equal treatment for all producers, might not be attained.[4]

---

[4] The legislation here under consideration is apparently not based upon the need to protect the public health or to maintain the

In Section 402, the Legislature has set forth the conditions under which farmer-producers may sell directly to consumers the milk of their herds produced on their farms without disrupting or endangering effective regulation of the remaining industry. In exempting the producer-handler, the Legislature not only sought to aid him in selling such milk but also to give recognition to the historical custom that individual, self-sufficient farm activity has traditionally been free of many forms of licensing and regulations. This exemption is an acknowledgement by the Legislature of the need to permit the local, family farm to continue to function unregulated by the Milk Control Commission in this particular activity.

We are not able to conclude that the limitation here under attack is not reasonably related to the achievement of the broad purpose of the Law. Complete exemption without the restriction that the milk at no time leave the producer's farm prior to sale might well result in a competitive advantage to the producer over other producers and dealers which the Legislature, in its judgment, sought to avoid as detrimental to the orderly and proper regulation of the entire industry.

Without discussing the peculiar economic factors involved in marketing, surplus and pool prices, it is evident that were appellees' contention to prevail, the so-called "jug-dealer" would be accorded an unfair and substantial advantage, not only over the regulated retailer, but more importantly over other milk producers who do not sell at retail and who are obliged to pool their product with other milk producers.[5] Conceiva-

sanitary condition of milk. A complete code for the inspection of dairy farms, the handling of raw milk, pasteurization, sanitation, and distribution is contained in numerous acts of the Legislature. See 31 P.S. §§511-683 (Supp. 1963).

[5] Producers selling at wholesale to a milk dealer are obliged to pool their product with other producers selling to such dealer, thereby receiving a blend price averaged in the proportion of the

bly, in the absence of the limitation complained of, the way may be opened to economically unwarranted expansion of herds and over-production by the exempt handler due to competitive advantages resulting from nonregulation. In that event, the stability of the industry may be imperiled and the legislative objectives defeated. Clearly, the Legislature was within its proper province in seeking to preclude such a result.

Careful consideration of the entire record satisfies us that all the Legislature intended to exempt in Section 402 was the family-farm type of producer-dealer operation. Surely, in the light of these legislative goals, the limitations set forth in Section 402 provide a reasonable test. In our view, it would be a contradiction of the legislative purpose and objective to permit the exempt farm operation to receive its product from a commercial handler or to have its milk processed by such a dealer.[6]

In passing, we feel it necessary to distinguish two cases in which classifications in milk control legisla-

---

dealer's various uses of milk (fluid and manufacturing) as classified by the Milk Control Commission under Section 804 (31 P.S. §700j-804). However, one entitled to the "jug-dealer" exemption can enjoy the higher valued fluid use for his own entire supply.

In *Nebbia v. New York*, supra, at 517-518, a regulatory pooling scheme similar to that in Pennsylvania was described and justified as follows: "Close adjustment of supply to demand is hindered by several factors difficult to control. Thus surplus milk presents a serious problem, as the prices which can be realized for it for other uses are much less than those obtainable for milk sold for consumption in fluid form or as cream. A satisfactory stabilization of prices for fluid milk requires that the burden of surplus milk be shared equally [i.e., pooled] by all producers and all distributors in the milk-shed."

More recently, to similar effect, see *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 316, 11 L. Ed. 2d 389, 393 (1964), at Note 3.

[6] Similar limitations in other jurisdictions have the same purpose and objective. See *Ideal Farms, Inc. v. Benson*, 288 F. 2d 608 (footnote 11) (3rd Cir. 1961), cert. den. 372 U.S. 965 (1963).

tion were struck down as arbitrary. In *Mayflower Farms, Inc. v. Ten Eyck,* 297 U.S. 266 (1936), the United States Supreme Court invalidated a provision of New York's statute because the classification rested solely upon the time the dealer commenced operations in the industry. The Florida Supreme Court, in *Gustafson v. City of Ocala,* 53 So. 2d 658 (1951), struck down a municipal ordinance which compelled pasteurization of milk within the county of which the city was a subdivision before milk could be sold in that city. In both cases, it is obvious that the classification had no reasonable relation to the objectives of the general milk control legislation.

Most recently, in *Daly v. Hemphill,* 411 Pa. 263, 271, 191 A. 2d 835, 840 (1963), we restated and reaffirmed the long-established rule that "an Act of Assembly will not be declared unconstitutional unless it *clearly, palpably* and *plainly* violates the Constitution." (Italics in the original.) Moreover, the burden rests heavily upon the party seeking to upset legislative action on constitutional grounds; all doubt is to be resolved in favor of sustaining the legislation. See *Anstine v. Zoning Board of Adjustment,* 411 Pa. 33, 36-37, 190 A. 2d 712, 714-15 (1963) and cases cited therein.

On the record before us, and particularly in view of the undoubted power of the Legislature to regulate the entire milk industry effectively, we cannot hold that the limitation on exemption here challenged clearly, palpably and plainly violates the Constitution of Pennsylvania or of the United States, or that the classification created is patently arbitrary and utterly lacking in rational justification. Nor can we hold that the classification bears no reasonable relation to the price structure which the Milk Control Commission is statutorily empowered to fix and maintain in a particular marketing area. In the absence of substantial and per-

suasive evidence to the contrary, the statute must stand.

Decree reversed. Each party to bear own costs.

Mr. Chief Justice BELL dissents.