331 A.2d 198

Frank M. TOSTO, a Citizen, Resident and Taxpayer of the Commonwealth of Pennsylvania, in his own right and on behalf of all other Residents and Taxpayers of the Commonwealth, Plaintiff,

v.

PENNSYLVANIA NURSING HOME LOAN AGENCY and Grace M. Sloan, State Treasurer, Defendants.

Supreme Court of Pennsylvania.

Argued Nov. 27, 1974.

Decided Jan. 27, 1975.

2

4

Gilbert J. Helwig, Robert L. Potter, Reed, Smith, Shaw & McClay, Pittsburgh, Israel Packel, Atty. Gen., Harrisburg, for Pa. Nursing Home Loan Agency.

Leonard J. Paletta, McArdle, McLaughlin, Paletta & McVay, Pittsburgh, for respondents.

Before JONES, C. J., and O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

This is a taxpayer's suit seeking to enjoin the operation of the recently enacted Nursing Home Loan Agency Law, Act of July 22, 1974, P.L. ——, No. 207, Pa.Legis. Serv. 571 (1974) (to be codified as 62 P.S. § 1521.101 et seq.). Plaintiff filed his complaint in the Commonwealth Court alleging a variety of constitutional defects. Defendants petitioned this Court to assume plenary jurisdiction,[1] which we did by per curiam order on October 25, 1974. The parties, after stipulating that no issues of fact existed to be tried, have filed motions for judgment on the pleadings. We determine that judgment should be awarded to defendants.

The N.H.L.A.L. stems from legislative concern with the inability of many nursing homes to provide safe and healthy accommodations for their residents.[2] Pursuant

1. Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 205, 17 P.S. § 211.205 (Supp.1974).

2. The Legislature "determined and declared as a matter of legislative finding" that "most nursing homes in the Commonwealth do not presently comply with State and Federal Safety Standards including the Life Safety Code" and that "financing of these safety improvements is apparently not presently available through private financing under terms and conditions which would enable the improvements to be made . . ." N.H.L.A.L. § 102.
The Life Safety Code, a publication of the National Fire Protection Association,
"deals with life safety from fire and like emergencies. It covers construction, protection, and occupancy features to minimize danger to life from fire, smoke, fumes, or panic before buildings are vacated. It specifies the number, size, and arrangement of exit facilities sufficient to permit prompt escape of occupants from buildings or structures in case of fire or other condition dangerous to life."
Life Safety Code 101–1 (21st ed. 1967).
Compliance with the Code is a prerequisite for reimbursement under the federal Medicare program (42 U.S.C.A. § 1395x(j)(13) (1974)) and for receipt of payments under the federal Medicaid program (42 U.S.C.A. § 1396a(a)(28)(F)(i) (1974)).
Moreover, all nursing homes in the Commonwealth must be licensed by the Department of Public Welfare. Public Welfare Code, Act of June 13, 1967, P.L. 31, art. 10, § 1002, 62 P.S. § 1002

to article VIII, section 7(a)(3) of the Constitution, P.S.,[3] the Legislature submitted to the voters the question whether they "favored the incurring of indebtedness by the Commonwealth of $100,000,000 for use as loans to repair, reconstruct and rehabilitate nursing homes in order to meet standards for health and safety?"[4] The program was approved by referendum on May 21, 1974.

(1968). A criterion for issuance of a license is that "the place to be used as a facility meet[s] all the requirements . . . of the applicable statutes, ordinances and regulations . . . ." Id. § 1007. One such applicable statute is the Act of April 27, 1927, P.L. 465, § 1 et seq., as amended, 35 P.S. § 1221 et seq. (1964). Section 1222 provides that one class of the "buildings and structures which it is intended that this act shall cover" are "convalescent and nursing homes." Section 1221 grants authority to the Department of Labor and Industry to promulgate rules and regulations prescribing standards and requirements relating to "fire and panic protection [so] as to provide for the safety and health of all persons employed, accommodated, housed, or assembled therein." The Department has adopted regulations, 34 Pa. Code §§ 37.641–.647, which require buildings classified as "institutional occupancies," which include nursing homes, to comply with the Life Safety Code. See Life Safety Code, ch. 10 (21st ed. 1967). In short, a prerequisite to licensure to operate a nursing home is compliance with the Life Safety Code.

This chain of interlocking statutes and regulations uncovers an anomaly in the language of the N.H.L.A.L. Section 103 of the Law defines "nursing home" as "any facility licensed or approved as a nursing home by the Department of Public Welfare under" the Public Welfare Code. As demonstrated above, the Department may not license a nursing home which does not satisfy the Life Safety Code. It would seem that nursing homes failing to comply with the Life Safety Code are not "nursing homes" within the meaning of the Law. This anomaly is probably the result of less than perfect drafting rather than considered legislative policy. We assume for purposes of deciding this case that the term "nursing home" in the N.H.L.A.L. includes: (1) nursing homes that did comply with all applicable standards when initially licensed by the Department but no longer satisfy the Life Safety Code; and (2) nursing homes that would be eligible for licensure by the Department but for noncompliance with the Life Safety Code, cf. N.H.L.A.L. § 301.

3. "Debt may be incurred without limit for purposes specifically itemized in the law authorizing such debt, if the question whether the debt shall be incurred has been submitted to the electors and approved by a majority of those voting on the question."

4. Act of April 11, 1974, P.L. ——, No. 62, § 3, Pa.Legis.Serv. 284 (1974).

Section 201 of the Law creates the Pennsylvania Nursing Home Loan Agency composed of six ex officio members from the executive departments and three gubernatorial appointees. § 202. The agency is authorized in § 203(6) "to make loans to nursing homes for repair, reconstruction and rehabilitation . . . in order that such nursing homes may meet State and Federal Safety Standards . . .." Section 301 provides:

"All nursing homes meeting applicable State and Federal regulations, with the exception of Life Safety Code, for the acceptance of Medicaid patients shall be eligible to apply for loans from the Nursing Home Loan Agency under provisions of this act." [5]

Funds for the loans are to be provided by a sale by competitive bidding of general obligation bonds (not exceeding $100,000,000) backed by the credit of the Commonwealth. §§ 401, 402(c). The Law creates a sinking fund for payment of interest and principal. § 408(a). The sources of the sinking fund are funds received in repayment of loans to nursing homes and appropriations by the Legislature. §§ 205, 411.

■ Plaintiff's first attack on the N.H.L.A.L. is cast in terms of the absence of a public purpose. He invokes the principle, well-settled for over a century, that "the legislature [does not have] any constitutional right to create a public debt, or to lay a tax, . . . in order to raise funds for a mere *private* purpose." *Sharpless v. Mayor of Philadelphia*, 21 Pa. 147, 168 (1853) (opinion of Black, C. J.) ; see *Citizens' Savings & Loan Association v. Topeka*, 87 U.S. (20 Wall.) 655, 22 L.Ed. 455 (1874). He does not contend that the safety of residents of nursing homes is not a proper subject of legislative

5. Applicable Federal standards for the acceptance of Medicaid patients are found in 42 U.S.C.A. § 1396a(a)(28) (1974). State standards are established by the Act of July 31, 1968, P.L. 904, § 5, amending the Public Welfare Code, Act of June 13, 1967, P.L. 31, art. 4, as amended, 62 P.S. § 443.1(3) (Supp.1974).

concern. Rather, he argues that (1) the means chosen by the Legislature are not "reasonably designed to achieve its stated public purpose"; [6] and (2) "the obvious private gain to proprietors of nursing homes" [7] undermines and dissipates the Law's public purpose. Both arguments are without merit.

Plaintiff correctly asserts that the means chosen by the Legislature must be "reasonably designed" to achieve permissible ends. *Basehore v. Hampden Industrial Development Authority*, 433 Pa. 40, 50, 248 A.2d 212, 217 (1968); see id. at 65, 248 A.2d at 224 (concurring opinion of this writer). However, the role of the judiciary in scrutinizing the particular approach selected by the Legislature is a limited one. We do not, at the invitation of a disgruntled taxpayer, re-assess the wisdom and expediency of alternative methods of solving public problems. "It is the province of the legislature, not the judiciary, . . . to determine the means necessary to combat" public problems, for with means as with ends, "the legislature, which is more responsive to the people and has more adequate facilities for gathering and assembling the requisite data, is in a better position to evaluate and determine" alternative approaches. *Basehore*, supra, at 49, 248 A.2d at 217; see also *Johnson v. Pennsylvania Housing Finance Agency*, 453 Pa. 329, 337–338, 309 A.2d 528, 533 (1973). Our inquiry is limited to a determination of whether the means selected are so "demonstrably irrelevant to the policy the Legislature is free to adopt" [8] as to be arbitrary and irrational.

In this case, plaintiff has failed to demonstrate that a program of making "loans to nursing homes for repair, reconstruction and rehabilitation" [9] is not a ra-

6. Brief for Plaintiff at 7.

7. Id. at 6.

8. *Nebbia v. New York*, 291 U.S. 502, 539, 54 S.Ct. 505, 517, 78 L. Ed. 940 (1934).

9. N.H.L.A.L. § 203(6).

tional approach to assisting nursing homes to comply with State and Federal safety standards and thus enhancing the safety of their residents. We conclude that the legislative program is reasonably designed to effectuate the Law's public purpose. See *Basehore*, supra, 433 Pa. at 49–50, 248 A.2d at 217.

Plaintiff's argument that private gain to nursing homes somehow outweighs the public purpose of the Law is equally meritless. We rejected this theory in *Basehore*, where we sustained the constitutionality of the Industrial Development Authority Law. Speaking through Mr. Justice (now Chief Justice) Jones, we stated:

> "The taxpayers' main concern is that the party who is really benefiting from this program is the private manufacturer who acquires an industrial plant at a much lower cost than he would have incurred had he built it himself. It is beyond question that private manufacturers receive a very large benefit from this program; however, this fact alone should not invalidate the program. If the legislative program is reasonably designed to combat a problem within the competence of the legislature and if the public will benefit from the project, then the project is sufficiently public in nature to withstand constitutional challenge."

433 Pa. at 50, 248 A.2d at 217; see also *Sharpless*, supra, 21 Pa. at 169; cf. Washington Park, Inc. Appeal, 425 Pa. 349, 353, 229 A.2d 1, 3 (1967); *Belovsky v. Redevelopment Authority of Philadelphia*, 357 Pa. 329, 341, 54 A. 2d 277, 283 (1947). Because the N.H.L.A.L. is reasonably designed to yield benefits to the public, it withstands this constitutional challenge.

■■ Plaintiff next contends that the N.H.L.A.L. involves an unconstitutional delegation of legislative power in violation of article II, section 1 of the Constitution.[10]

---

**10.** "The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."

He invokes the so-called nondelegation rule which, as a "natural corollary" of article II, section 1, "requires that the basic policy choices involved in 'legislative power' actually be made by the Legislature as constitutionally mandated." *Chartiers Valley Joint Schools v. Allegheny County Board of School Directors*, 418 Pa. 520, 529, 211 A.2d 487, 492 (1965). More specifically, the rule demands that, when the Legislature delegates policymaking discretion to administrative agencies, it must make the "basic policy choices" which will serve as standards to guide and restrain the exercise of discretion.[11] See *Commonwealth v. Cherney*, 454 Pa. 285, 289–290, 312 A.2d 38, 41 (1973); *DePaul v. Kauffman*, 441 Pa. 386, 391–392, 272 A.2d 500, 503 (1971); *Chartiers Valley Joint Schools*, supra; *Commonwealth Water & Power Resources Board v. Green Spring Co.*, 394 Pa. 1, 5, 145 A.2d 178, 183 (1958); *O'Hara's Appeal*, 389 Pa. 35, 47–48, 131 A.2d 587, 593 (1957).

 Plaintiff argues that the Legislature did not provide standards in the N.H.L.A.L. He points to various sections of the Law [12] which grant the agency policy

11. Our prior cases have sometimes embodied a distinction between lawmaking and administrative policymaking. See, e. g., Belovsky v. Redevelopment Authority of Philadelphia, 357 Pa. 329, 342, 54 A.2d 277, 284 (1947):

"While the legislature cannot delegate the power to make a law, it may, where necessary, confer authority and discretion in connection with the execution of the law . . . ."

This distinction has been cogently criticized by a noted commentator. See 1 K. Davis Administrative Law Treatise § 2.02 (1958).

12. E. g., § 203(6):

"The agency shall have the following powers:

. . . . . . . . . .

(6) . . . to make loans to nursing homes . . . and to set the terms and conditions of the loans as the agency deems necessary."

§ 303:

"In the event the loan application requests exceed the loan moneys available the agency shall after advice from and con-

making discretion without, he contends, adequate standards. In this he is mistaken. The entire Law reveals that the agency's policy decisions must be directed to the effectuation of the Legislature's basic policy of assisting nursing homes that do not comply with the Life Safety Code [13] and are unable to achieve compliance through private sources of financing,[14] which assistance is to be given with prudence for protection of the loan fund.[15] This pervasive general policy is clearly sufficient to satisfy the constitutional requirement that "basic policy choices" be made by the Legislature. But the Law goes even further. It provides very specific definitions of pivotal statutory terms [16] and detailed guidelines for certain important agency decisions.[17] We have no doubt that the standards requirement has been satisfied.

More importantly, the N.H.L.A.L. provides numerous procedural guidelines for protection against administrative arbitrariness and caprice.[18] For example, the agen-

sultation with the Department of Health establish criteria for the making of loans and determine priorities among applicants."
§ 304(D):
　"Eligibility for loan refinancing shall be based upon standards established by the agency. The agency shall require such security, assurances, covenants and conditions as it deems necessary . . . ."

13.　See §§ 102(1), 203(6), 301, 302(a)(1).

14.　See §§ 102(2), 302(a)(4).

15.　See §§ 203(6), 203(12), 204, 206, 302(a)(5), 302(b), 302(c), 304(D).

16.　Section 103; see *Johnson v. Pennsylvania Housing Finance Agency*, 453 Pa. 329, 341, 309 A.2d 528, 535 (1973).

17.　See, e. g., § 302(a)(1)–(5) (contents of loan application form); § 303(1)–(4) (criteria for determination of priority among applicants).

18.　See *Kugler v. Yocum*, 69 Cal.2d 371, 380, 71 Cal.Rptr. 687, 693, 445 P.2d 303, 309 (1968); *Elk Run Telephone Co. v. General Telephone Co.*, 160 N.W.2d 311, 316–317 (Iowa, 1968); *Department of Health v. Owens-Corning Fiberglass Corp.*, 100 N.J.Super. 366, 385, 242 A.2d 21, 31 (1968), aff'd per curiam, 53 N.J. 248, 250 A. 2d 11 (1969); *Gilman v. City of Newark*, 73 N.J.Super. 562, 595, 180 A.2d 365, 384, (1962); *Warren v. Marion County*, 222 Or. 307,

cy is required to establish criteria for use in determination of priority among applicants [19] and eligibility for loan refinancing [20] and to develop a standard form for loan applications.[21] The use of neutral, generally applicable criteria and forms is an important safeguard against the arbitrariness of ad hoc decision making. In addition, section 203(2) of the Law provides that the promulgation of rules and regulations by the agency must be in accordance with the Commonwealth Documents Laws [22] assuring regularity and due notice in administrative policymaking.

The Legislature has provided adequate standards and guidelines for the guidance and restraint of administrative discretion. We reject plaintiff's contention as meritless.

■■■■■■ Plaintiff argues that the N.H.L.A.L. creates an arbitrary classification and thus is a "special law" violating article III, section 32 of the Constitution.[23] Pointing to section 301 of the Law,[24] he argues that it arbitrarily singles out the benefited class of nursing homes "from all the other nursing homes that may not meet one or the other of State or Federal regulations for acceptance of Medicaid patients. Yet, these other facilities are caring for old and disabled citizens of Pennsylvania and

313, 353 P.2d 257, 261 (1960); K. Davis, Administrative Law Treatise §§ 2.00 to 2.00–6 (Supp.1970).

19. Section 303.

20. Section 304(D).

21. Section 302(a).

22. Act of July 31, 1968, P.L. 769, as amended, 45 P.S. § 1101 et seq. (Supp.1974).

23. "The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law . . . . ."

24. "All nursing homes meeting applicable State and Federal regulations, with the exception of Life Safety Code, for the acceptance of Medicaid patients shall be eligible to apply for loans from the Nursing Home Loan Agency under provisions of this act."

urgently require this type of loan." [25] We are not persuaded.

It is well settled that the prohibition of special laws does not forbid the Legislature from creating statutory classifications. Rather it requires only that a classification must have some rational relationship to a proper state purpose. See *Johnson v. Pennsylvania Housing Finance Agency*, 453 Pa. 329, 347, 309 A.2d 528, 538 (1973); *Milk Control Commission v. Battista*, 413 Pa. 652, 198 A.2d 840, appeal dismissed, 379 U.S. 3, 85 S.Ct. 75, 13 L.Ed.2d 22 (1964); *Philadelphia v. Smith*, 412 Pa. 262, 268–269, 194 A.2d 177, 180 (1963); *Bargain City U. S. A. v. Dilworth*, 407 Pa. 129, 133, 179 A.2d 439, 442 (1962). Confining loans to nursing homes which comply with all "applicable State and Federal regulations, with the exception of [the] Life Safety Code, for the acceptance of Medicaid patients" is rationally related to a purpose of assuring that loan recipients are in all respects (except for compliance with the Life Safety Code) fit institutions for the care of their patients. We have no doubt that this purpose is a proper one, for it "works . . . to promote the general welfare . . . ." Note, Developments in the law—Equal Protection, 82 Harv.L.Rev. 1065, 1081 (1969). Accordingly, the N.H. L.A.L. is not a "special law."

Plaintiff's final contention is that the N.H. L.A.L. violates article VIII, section 8 of the Constitution, which provides:

"The credit of the Commonwealth shall not be pledged or loaned to any individual, company, corporation or association nor shall the Commonwealth become a joint owner or stockholder in any company, corporation or association."

He argues that the lending to nursing home proprietors of funds raised by an issue of general obligation Com-

25. Brief for Plaintiff at 12.

monwealth bonds constitutes a pledge or loan of Commonwealth credit to the nursing homes. He correctly points out that in our two prior cases dealing with section 8, *Johnson v. Pennsylvania Housing Finance Agency*, 453 Pa. 329, 309 A.2d 528 (1973) ; *Basehore v. Hampden Industrial Development Authority*, 433 Pa. 40, 248 A.2d 212 (1968), the obligations involved were revenue bonds not backed by the credit of the Commonwealth. We are thus presented for the first time with the question of the application of article VIII, section 8 to general obligation bonds.

In determining the meaning of section 8, we look to the evil to which it is addressed. See Statutory Construction Act, 1 Pa.C.S. § 1921(c)(3) (Special Pamphlet, 1973). In the mid-nineteenth century, industrial expansion, particularly the growth of the railroads, created great demands for investment capital. When the private sector was unable to satisfy the demand, state and local governments stepped in to fill the need.[26] One common method of assisting the railroads to raise capital was public guaranty of railroad obligations, frequently taking the form of an exchange of railroad bonds for state bonds, which the railroad then sold on the open market. In this way, railroads were able to attract investors who, without the credit of the state on which to rely, would not have invested. Article VIII, section 8 was adopted in 1857 in reaction to and with the specific purpose of eliminating these speculative forms of financing.[27] The phrase "pledge or loan of credit" is a term of art referring to these financing devices and was clearly not intended to prohibit other sorts of financial transactions between the Commonwealth and private citizens or cor-

26. For a description of one such scheme, see *Sharpless v. Mayor of Philadelphia,* 21 Pa. 147, 149–151 (1853).

27. Pinsky, State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach, 111 U.Pa.L. Rev. 265, 277–82 (1963).

porations that serve a public purpose and are otherwise lawful.

Courts may not declare a statute unconstitutional "unless it *clearly, palpably,* and *plainly* violates the Constitution." *Daly v. Hemphill,* 411 Pa. 263, 271, 191 A.2d 835, 840 (1963). This presumption in favor of the constitutionality of a statute is strengthened where, as here, the program has been submitted to the voters and has received their approval. We would be overstepping our constitutional bounds were we to strike down an act bolstered by such a strong presumption of constitutionality on the basis of a constitutional provision designed to eliminate an evil far removed from the public goals of this enlightened legislation. Plaintiff has failed to persuade us that the N.H.L.A.L. is prohibited by article VIII, section 8.

We have examined the N.H.L.A.L. and the constitutional defects [28] which plaintiff perceives. We conclude that they are meritless. Judgment on the pleadings is therefore entered for defendants. Each party to pay own costs.

EAGEN and NIX, JJ., did not participate in the consideration or decision of this case.

---

28. In his complaint and motion for judgment, plaintiff also stated that the N.H.L.A.L. creates exemptions from taxation in violation of Pa.Const. art. VIII, and irrevocably grants special privileges and immunities in violation of Pa.Const. art. I, § 17. However, he has abandoned these contentions in his brief and therefore we do not address them.