**[J-70-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | |
|---|---|
| CITY OF LANCASTER, BOROUGH OF CARLISLE, AND BOROUGH OF COLUMBIA, | : No. 107 MAP 2022 |
| | : |
| | : Appeal from the Order of the |
| | : Commonwealth Court at No. 251 |
| Appellees | : MD 2019 dated October 11, 2022 |
| | : |
| | : ARGUED: November 29, 2023 |
| v. | : |
| | : |
| | : |
| PENNSYLVANIA PUBLIC UTILITY COMMISSION, | : |
| | : |
| | : |
| Appellant | : |

**OPINION**

**JUSTICE BROBSON**                                                    **DECIDED: April 25, 2024**

In this direct appeal, the Pennsylvania Public Utility Commission (PUC) challenges a decision of the Commonwealth Court concluding that Section 59.18 of the PUC's regulations, 52 Pa. Code § 59.18, violates Article II, Section 1 of the Pennsylvania Constitution and is, therefore, unenforceable.[1]  Pertinently, the Commonwealth Court held that Section 59.18 unlawfully delegates unfettered authority to natural gas distribution companies (NGDCs) to determine the location of gas meters in historic districts of the Commonwealth.  Upon careful review, we conclude that the General

---

[1] Article II, Section 1 of the Pennsylvania Constitution provides that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."

Assembly never enacted a statute vesting the PUC with any legislative authority under Article II, Section 1—*i.e.*, imposing any duty on the PUC—to locate gas meters in historic districts that would give rise to any constitutional concerns regarding delegation. Accordingly, we reverse.

## I. BACKGROUND

In 2014, the PUC amended Section 59.18 of its regulations, which, in part, addresses gas meters in historic districts. Section 59.18 provides, in pertinent part:

(a) *General requirements for meter and regulator location*.

(1) Unless otherwise allowed or required in this section, meters and regulators must be located outside and aboveground.

(2) Except in the case of an emergency, a utility shall provide written notice to a utility customer by first class mail or by personal delivery at least 30 days prior to relocating and subsequently installing a meter or regulator outside the customer's building. . . .

. . . .

(5) When selecting a meter or service regulator location, a utility shall consider potential damage by outside forces.

(6) The meter location must accommodate access for meter reading, inspection, repairs, testing, changing and operation of the gas shut-off valve.

(7) When feasible and practical to do so, the meter location must accommodate the installation of the service line in a straight line perpendicular to the main.

(8) Meters and service regulators may not be installed in the following locations:

(i) Beneath or in front of windows or other building openings that may directly obstruct emergency fire exits.

(ii) Under interior stairways.

(iii) Under exterior stairways, unless an alternate means of egress exists and the meter and service regulator are installed in a well-vented location under stairs constructed of noncombustible material.

(iv) A crawl space.

(v) Near building air intakes under local or State building codes.

(vi) In contact with soil or other potentially corrosive materials.

. . . .

(d) *Inside meter locations*.

(1) Inside meter locations shall *be considered* only when:

(i) The service line pressure is less than 10 psig.

(ii) A meter is located in a building that meets one of the following criteria:

. . . .

(D) *A building is located within a locally designated historic district or is eligible for the listing, or a building is individually designated under a local ordinance as a historic landmark or is eligible for the listing*.

(iii) Protection from ambient temperatures is necessary to avoid meter freeze-ups.

(iv) A utility determines that a meter is subject to a high risk of vandalism based on the utility's prior experience.

(v) A utility determines that an outside meter location is neither feasible nor practical.

(2) Except for low pressure systems with service line pressure less than 10 psig, regulators must be located outside when a meter is located inside.

(3) Installed inside meters must be attached to an operable outside shut[-]off valve.

(4) Meters installed within a building must be located in a ventilated place not less than 3 feet (914 millimeters) from a source of ignition or source of heat which may damage the meter.

52 Pa. Code § 59.18 (emphasis added).

The City of Lancaster, Borough of Carlisle, and Borough of Columbia (Municipalities) have historic districts created pursuant to what is commonly referred to as the Municipal Historic Districts Law (MHDL).[2]  In 2019, the Municipalities filed a petition for review (Petition) in the Commonwealth Court's original jurisdiction, seeking relief on

_____

[2] Act of June 13, 1961, P.L. 282, *as amended*, 53 P.S. §§ 8001-8006.

two counts under the Declaratory Judgments Act[3] concerning the validity of Section 59.18 of the PUC's regulations. Relevant here, in Count II of the Petition, the Municipalities averred that Section 59.18 violates Article II, Section 1 of the Pennsylvania Constitution because "Section 59.18 cedes the PUC's statutorily-granted authority to enact rules and regulations 'not inconsistent with law' [under Section 501(b) of the Pennsylvania Public Utility Code (Code),[4] 66 Pa. C.S. § 501(b),] to" NGDCs and, therefore, grants NGDCs "unfettered discretion to determine whether meters will be located on the interior or exterior of homes in historic districts" in the Municipalities. (Petition ¶¶ 47-49, 55, 56 (quoting 66 Pa. C.S. § 501(b)).) Rather, the Municipalities insisted that Article II, Section 1 requires the General Assembly to make legislative choices and that the PUC, therefore, could not "'subdelegate' its regulatory authority to an outside party without clear legislative intent permitting it to do so."[5] (*Id.* ¶ 50, 54.) As to relief, the Municipalities asked the Commonwealth Court to declare that Section 59.18 is "unconstitutional, improper, and illegal" and to decree "that the placement of [gas] meters shall be subject to any ordinance properly adopted by a Pennsylvania municipality" pursuant to the MHDL. (Petition, Count II "Wherefore" clause, A-B.)

The PUC filed preliminary objections to the Petition. As to Count II, the PUC claimed that the Municipalities failed to exhaust administrative remedies and allege facts demonstrating direct and immediate harm to properties within their historic districts as a

---

[3] 42 Pa. C.S. §§ 7531-7541.

[4] 66 Pa. C.S. §§ 101-3316.

[5] "At the heart of the non-delegation doctrine, which we have described as a 'natural corollary' to the text of Article II, Section 1 [of the Pennsylvania Constitution], is the tenet that the General Assembly cannot delegate 'to any other branch of government or to any other body or authority' the power to make law." *Protz v. Workers' Comp. Appeal Bd. (Derry Area Sch. Dist.)*, 161 A.3d 827, 833 (Pa. 2017) (quoting *Blackwell v. Commonwealth*, 567 A.2d 630, 636 (Pa. 1989)).

result of the amendments to Section 59.18 of the PUC's regulations and that the Municipalities sought an advisory opinion without the existence of an actual case or controversy. A three-judge panel of the Commonwealth Court disagreed with the PUC's averments as to Count II, overruled those preliminary objections, and directed the PUC to file an answer.[6] *See City of Lancaster v. Pa. Pub. Util. Comm'n* (Pa. Cmwlth., No. 251 M.D. 2019, filed Feb. 21, 2020). The PUC filed an application for reconsideration of the Commonwealth Court's decision, which the Commonwealth Court denied.

The Municipalities subsequently filed an application (Application) with the Commonwealth Court, seeking summary relief on their claim that the PUC unconstitutionally delegated unfettered legislative authority to NGDCs via Section 59.18 of the PUC's regulations as to the location of gas meters in historic districts. More specifically, the Municipalities asserted that the PUC delegated legislative authority to NGDCs without adequate standards to: (1) guide NGDCs in determining where to place a meter at a property located in a historic district; and (2) prevent arbitrary NGDC decisions mandating meter relocations. (Application at 9-10; Municipalities' Br. in Support of Application at 24, 27.) The Municipalities reiterated that, in the absence of those standards, Section 59.18 "delegates the PUC's statutorily-granted authority to enact rules and regulations to private companies," and, as a result, violates Article II, Section 1 of the Pennsylvania Constitution. (Application at 9; Municipalities' Br. in Support of Application at 13, 27.) The Municipalities further averred that the Code failed to provide an adequate review process of NGDCs' meter placement decisions. (Application at 9-10; Municipalities' Br. in Support of Application at 30-32.)

---

[6] The Commonwealth Court sustained the PUC's preliminary objections to Count I of the Petition and dismissed Count I with prejudice. The case proceeded with Count II, the only remaining claim.

The PUC contended, in response to the Application that

> Section 59.18 of the [PUC's] regulations . . . does not vest absolute discretion in NGDCs with respect to the location of natural gas meters. Section 59.18 clearly states that a[] NGDC must consider the location of a natural gas meter inside a building in a historic district. If the NGDC determines that it cannot accommodate a natural gas meter inside the building, the aggrieved party can ultimately have the [PUC] review this determination pursuant to Section 701 of the [Code], 66 Pa. C.S. § 701,[7] and Section 5.21 of . . . the [PUC]'s [r]egulations, 52 Pa. Code § 5.21.[8]

(PUC Br. in Opposition to Application at 17-18, 22.) The PUC also generally relied on Section 1501 of the Code, 66 Pa. C.S. § 1501, titled "Character of service and facilities," which provides, in relevant part:

> Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

(*Id*. at 18.)

---

[7] Section 701 of the Code provides:

> The [PUC], or any person, corporation, or municipal corporation having an interest in the subject matter, or any public utility concerned, may complain in writing, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the [PUC] has jurisdiction to administer, or of any regulation or order of the [PUC]. Any public utility, or other person, or corporation likewise may complain of any regulation or order of the [PUC], which the complainant is or has been required by the [PUC] to observe or carry into effect. The Commonwealth through the Attorney General may be a complainant before the [PUC] in any matter solely as an advocate for the Commonwealth as a consumer of public utility services. The [PUC] may prescribe the form of complaints filed under this section.

[8] Section 5.21(a) of the PUC's regulations provides that "[a] person complaining of an act done or omitted to be done by a person subject to the jurisdiction of the [PUC], in violation, or claimed violation of a statute which the [PUC] has jurisdiction to administer, or of a regulation or order of the [PUC], may file a formal complaint with the [PUC]."

In a reported opinion, an *en banc* panel of the Commonwealth Court granted the Municipalities' Application, finding the Municipalities' claims persuasive that Section 59.18 of the PUC's regulations unconstitutionally delegates legislative authority to NGDCs to determine the location of gas meters in historic districts. *City of Lancaster v. Pa. Pub. Util. Comm'n*, 284 A.3d 522 (Pa. Cmwlth. 2022).[9] Referencing its February 2020 opinion, the Commonwealth Court observed:

> [The PUC's] Final Rulemaking Order [concerning the amendments to Section 59.18 of the PUC's regulations] states that "*the utility will continue to retain discretion in applying this regulation*," admits that "*the regulation does contain provisions that delegate discretion to the utility in making a determination with respect to locating an outside meter*," and confirms that "due to [a utility's] public safety obligations," "*it is necessary that . . . the utility be allowed to make the final decision*."

*Lancaster*, 284 A.3d at 527 (internal citations and some alterations omitted) (emphasis and one alteration in original) (quoting *Lancaster*, slip op. at 26). The Commonwealth Court further pointed to this Court's decision in *Protz*, wherein we emphasized:

> [W]hen the General Assembly empowers some other branch or body to act, our jurisprudence requires "that the basic policy choices involved in 'legislative power' actually be made by the [l]egislature as constitutionally mandated." *Tosto v. Pa. Nursing Home Loan Agency*, . . . 331 A.2d 198, 202 ([Pa.] 1975). This constraint serves two purposes. First, it ensures that duly authorized and politically responsible officials make all of the necessary policy decisions, as is their mandate per the electorate. And second, it seeks to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power.
>
> . . . .

---

[9] The Commonwealth Court first noted that "[a]n application for summary relief is appropriate where a party lodges a facial challenge to the constitutionality of a statute," where no facts are in dispute, and a party's right to judgment is clear. *Lancaster*, 284 A.3d at 525 (emphasis omitted) (quoting *McLinko v. Dep't of State*, 270 A.3d 1243, 1250 (Pa. Cmwlth.), *aff'd in part, rev'd in part on other grounds*, 279 A.3d 539 (Pa. 2022), *cert. denied*, 143 S. Ct. 573 (2023), and *Jubelirer v. Rendell*, 953 A.2d 514, 521 (Pa. 2008)). Observing that the Municipalities were raising a legal question concerning the constitutional validity of Section 59.18 of the PUC's regulations and not a factual question, it opined that the Application was appropriate.

Although [the Pennsylvania] Constitution generally forbids the delegation of "legislative power," it nonetheless permits the General Assembly, in some instances, to assign the authority and discretion to execute or administer a law. *Blackwell*, . . . 567 A.2d at 637. When the General Assembly does so, the Constitution imposes two fundamental limitations. *First, as mentioned, the General Assembly must make "the basic policy choices," and second, the legislation must include "adequate standards which will guide and restrain the exercise of the delegated administrative functions." Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, . . . 877 A.2d 383, 418 ([Pa.] 2005); *State Bd. of Chiropractic Exam'rs* [*v. Life Fellowship of Pa.*], 272 A.2d [478,] 481 ([Pa.1971)] (quoting *Chartiers Valley Joint Sch. v. C[n]ty. Bd. of Sch. Dirs. of Allegheny C[n]ty.*, . . . 211 A.2d 487, 492-93 ([Pa.] 1965)).

*Lancaster*, 284 A.3d at 528 (emphasis and some alterations in original) (quoting *Protz*, 161 A.3d at 833-34).

Explaining that a reviewing court must look to the letter of the law, the underlying purpose of a statute, and its reasonable effect to determine whether adequate delegative standards have been established, the Commonwealth Court compared this case to *City of Williamsport Bureau of Codes v. DeRaffele*, 170 A.3d 1270 (Pa. Cmwlth. 2017). *Id.* at 528-29 (quoting *Gambling Expansion Fund*, 877 A.2d at 418). In that case, the Commonwealth Court observed that it refused to enforce on constitutional grounds Section 11018.13 of the Third Class City Code, 11 Pa. C.S. § 11018.13, because the provision granted unfettered authority to the International Code Council, a private entity, to create maintenance codes for the City of Williamsport. *Lancaster*, 284 A.3d at 529 (quoting *City of Williamsport*, 170 A.3d at 1274-75).

Based on those cases and principles, the Commonwealth Court rejected the PUC's assertion that Section 59.18 of the PUC's regulations somehow imposes an affirmative duty on NGDCs to accommodate an indoor meter in a historic district, noting that Section 59.18(d)(1) only provides that an inside meter "shall be considered" when the building is in a historic district. *Id.* at 531 (quoting 52 Pa. Code § 59.18(d)(1), and PUC's Br. in Opposition to Application ("Section 59.18 does not guide the NGDC, and it

certainly does not create a presumption that a meter must remain inside a building unless the NGDC 'cannot accommodate' it.")).  As a result, the Commonwealth Court concluded that Section 59.18 unlawfully grants NGDCs "complete discretion" regarding the placement of gas meters in historic districts "with absolutely no guidance . . . [or] 'safeguards to protect against arbitrary, *ad hoc* decision making.'"  *Id*. at 532 (alteration in original) (quoting *425 Prop. Assoc. of Alpha Chi Rho, Inc. v. State Coll. Borough Zoning Hearing Bd.*, 223 A.3d 300, 313 n.9 (Pa. Cmwlth. 2022)).

The Commonwealth Court also found unconvincing the PUC's assertion that the discretion of NGDCs would be curtailed by the right of the PUC review under Section 701 of the Code and Section 5.21(a) of the PUC's regulations, observing, it opined in its February 2020 opinion, that,

> [a]lthough . . . it is possible that the owners of the historic buildings may discuss the location of the meter with the NGDC as part of the notice process, [Section ]59.18(d) does not appear to have a formal, adjudicative process.  Most notably, contrary to that argued by the PUC, there is no formal application procedure embedded within [Section ]59.18.  Further, in light of the plain language of [Section ]59.18(d), a[] NGDC is not required to set forth the basis or reasons for its determination as to whether a meter should be located inside or outside a structure.

*Id*. at 534 (most alterations in original) (quoting *Lancaster*, slip op. at 25).  Accordingly, because it reasoned that there were no facts in dispute and the Municipalities were entitled to judgment as a matter of law on their claim that Section 59.18 of the PUC's regulations violates Article II, Section 1 of the Pennsylvania Constitution, the Commonwealth Court granted the Municipalities' Application, thereby rendering Section 59.18 unenforceable.  *See id*. at 537.[10]

---

[10] The Commonwealth Court did not grant the Municipalities' requested relief that the Commonwealth decree that the local ordinances created pursuant to the MHDL govern over any of the PUC's regulations.  It merely rendered Section 59.18 of the PUC's regulations unenforceable.

Judge McCullough, joined by President Judge Cohn Jubelirer, authored a dissenting opinion. Judge McCullough observed that, pursuant to Section 1501 of the Code, NGDCs are required to "furnish and maintain adequate, efficient, safe, and reasonable service and facilities that are necessary and proper for the accommodation, convenience, and safety of . . . NGDCs' patrons, employees, and the public." *Lancaster*, 284 A.3d at 540 (citing 66 Pa. C.S. § 1501). Judge McCullough explained that the PUC amended Section 59.18 of its regulations as a safety precaution to protect the public from gas leaks and explosions. *See id*. at 538 (citing and quoting Final Rulemaking Order, 44 Pa. B. at 5835-36, 5838 (2014)). Thus, "[r]equiring NGDCs to consider, in the first instance, whether it is safe, convenient, adequate, efficient, and reasonable to locate a meter inside in a historic district," Judge McCullough reasoned, "is not an unlawful delegation of the [PUC's] authority." *Id.* at 540-41.

Judge McCullough likewise disagreed with the majority's conclusion that Section 59.18 of the PUC's regulations "lacks adequate standards and/or procedures to guide [NGDCs] in determining where to place a meter located in a historic district." *See id*. at 537, 540-45. Rather, Judge McCullough insisted that NGDCs must, in the first instance, determine whether a gas meter can be placed indoors "on a case-by-case basis to ensure the safety of the public and its personnel," which Judge McCullough reasoned NGDCs can do based on the adequate standards set forth in Section 59.18 of the PUC's regulations. *Id*. at 545. Thereafter, Judge McCullough opined that, if customers are unsatisfied with the placement of gas meters, customers have a right of appeal to the PUC to argue why their particular aesthetic "is feasible while still meeting the overarching concern for the safety of . . . NGDCs' patrons, employees, and the public." *Id*. at 545. For those reasons, Judge McCullough would have denied the Municipalities' Application.

## II. ISSUES

The PUC appeals from the Commonwealth Court's *en banc* decision raising the following issues:

(1) Did the Commonwealth Court err in granting summary relief when it failed to recognize the [PUC's] statutorily prescribed procedure to review the placement of utility facilities in the Public Utility Code at Sections 701, 1501 and 2205, 66 Pa. C.S. §§ 701, 1501 and 2205?

(2) Did the Commonwealth Court err in granting summary relief in accepting the Municipalities' assertion that Section 59.18 [of the PUC's regulations], as amended on May 22, 2014, 52 Pa. Code § 59.18, would cause damage to historic facades in historic districts but failed to conduct an analysis of the safety issues regarding meter placement versus historic aesthetic?

(3) Did the Commonwealth Court err in granting summary relief when the Municipalities failed to demonstrate the existence of an actual controversy when there is a material question as to whether Section 59.18 [of the PUC's regulations], as amended on May 22, 2014, 52 Pa. Code § 59.18, actually operates to cause harm to historic aesthetic, value, or other attribute[s] of properties in the Municipalities' historic districts?

"An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute." *Jubelirer*, 953 A.2d at 521. "This Court's review of questions of law, such as whether summary judgment was appropriate . . . , is plenary." *Sphere Drake Ins. Co. v. Phila. Gas Works*, 782 A.2d 510, 512 (Pa. 2001).

## III. DISCUSSION

Seemingly at the heart of this case is the non-delegation doctrine, which doctrine derives from Article II, Section 1 of the Pennsylvania Constitution. As touched upon above, the non-delegation doctrine "requires that the basic policy choices involved in 'legislative power' actually be made by the [l]egislature as constitutionally mandated." *Chartiers*, 211 A.2d at 492. "While the legislature cannot delegate the power to make a law, it may, where necessary, confer authority and discretion in connection with the execution of the law . . . ." *Belovsky v. Redevelopment Auth.*, 54 A.2d 277, 284 (Pa. 1947). The non-delegation doctrine, at its core, serves as a check on the General

Assembly's delegative power. "More specifically, the rule demands that, when the [l]egislature delegates policymaking discretion to administrative agencies, it must make the 'basic policy choices' which will serve as standards to guide and restrain the exercise of discretion." *Tosto*, 331 A.2d at 202-03 (quoting *Chartiers*, 211 A.2d at 492).

These principles were exemplified in *Protz*, where we considered a non-delegation challenge to the former Section 306(a.2) of the Workers' Compensation Act.[11] Section 306(a.2) allowed "employers to demand that a claimant undergo an impairment-rating evaluation (IRE), during which a physician must determine the 'degree of impairment' that is due to the claimant's compensable injury." *Protz*, 161 A.3d at 830 (quoting 77 P.S. § 511.2(1) (repealed 2018)). As part of that process, Section 306(a.2) required physicians to apply the "'most recent edition' of the American Medical Association (AMA) *Guides to the Evaluation of Permanent Impairment*." *Id*. (quoting 77 P.S. § 511.2 (repealed 2018)). Because Section 306(a.2) failed to "favor any particular policies relative to the *Guides*' methodology for grading impairments," "prescribe any standards to guide and restrain the AMA's discretion to create such a methodology," or provide procedural mechanisms to protect against "administrative arbitrariness and caprice," we explained that Section 306(a.2) gave the AMA "unfettered control" over a legislative function that is prohibited by the non-delegation doctrine to Article II, Section 1 of the Pennsylvania Constitution. *Id*. at 835-36, 838 (quoting *Tosto*, 331 A.2d at 203).

The Commonwealth Court reached a similar conclusion in *City of Williamsport*, wherein a landowner was charged with and convicted of various offenses under the City of Williamsport's (the City) 2015 Maintenance Code. On appeal before the Commonwealth Court, the landowner generally challenged the validity of

---

[11] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 511.2 (repealed 2018).

the 2015 Maintenance Code. By way of background, in 2004, the City adopted the 2003 International Property Maintenance Code, which was created by the International Code Council, a private, third party. The City argued that it was permitted to charge the landowner under the 2015 Maintenance Code because its adoption of the 2003 International Property Maintenance Code "encompassed all subsequent changes to the [C]ode"—*i.e.*, that the 2003 Code was self-updating. *City of Williamsport*, 170 A.3d at 1273. In support, the City referenced Section 11018.13(a) of the Third Class City Code, 11 Pa. C.S. § 11018.13(a), which provides that a council may enact "by reference" "all or a portion of [a] standard or nationally recognized code as an ordinance of the city." *Id*. (quoting 11 Pa. C.S. § 11018.13(a)). Further, Section 11018.13(b)(2) provides that "[a]n ordinance which incorporates standard or nationally recognized code *amendments* by reference shall become effective after the *same procedure and in the same manner as is specified in this section for original adoption of the code*." *Id*. (emphasis added) (quoting 11 Pa. C.S. § 11018.13(b)(2)).

The Commonwealth Court disagreed with the City's suggestion, however, that Section 11018.13 of the Third Class City Code allows third-class "cities to adopt entirely new ordinances, or provisions thereof, sight unseen." *Id*. at 1274. "Instead," the Commonwealth Court reasoned that "Section 11018.13 dictates that changes to a third[-]class city's code that are made *prior to the adoption of the code* are incorporated into the ordinance." *Id*. (emphasis in original). Thus, the Commonwealth Court concluded that the City "did not have the authority to adopt the 2015 Maintenance Code eleven years before it was written." *Id*. In so doing, the Commonwealth Court further reasoned that to accept the City's argument "would invariably [cause] a constitutional problem under the non-delegation doctrine" pursuant to *Protz* because it would "effectively grant the International Code Council unfettered authority to create a new controlling Maintenance

Code for the residents of" the City. *Id*. at 1274-75. Accordingly, the Commonwealth Court concluded that the landowner could not be charged with and convicted of offenses under the 2015 Maintenance Code because it was invalid.

The parties dispute the applicability of the foregoing principles as they pertain to Section 59.18 of the PUC's regulations and the NGDCs' actions relative to gas meter placement in historic districts, advancing generally the same contentions they made before the Commonwealth Court concerning the constitutional validity of Section 59.18 under the non-delegation doctrine and aligning themselves more or less with the majority and dissenting factions of the Commonwealth Court. The parties, however, mischaracterize the nature of Section 59.18. Principally, Section 59.18 does not involve the delegation of any legislative authority—of either the General Assembly or the PUC— to NGDCs concerning the placement of gas meters in historic districts; rather, Section 59.18 is merely a regulatory act under the PUC's administrative authority limiting the placement of gas meters in certain locations for the safety of the public. Stated differently, the General Assembly never enacted a statute empowering the PUC to decide the location of gas meters in historic districts in Pennsylvania.[12] To the contrary, the location of gas meters in historic districts is subject to NGDCs'—not the PUC's— discretion in their role as public utilities.[13]

---

[12] The Municipalities fail to reference such a statute, nor have we uncovered one.

[13] Indeed, the prior version of Section 59.18 of the PUC's regulations merely provided:

> Meters shall be installed in either of the following locations:
>
> 1. Inside the building, preferably in a dry, well-ventilated place not subject to excessive heat, and as near as possible to the point of entrance of the pipe supplying service to the building.
>
> 2. Outside the building at a location selected by the utility. A meter cover or housing is required if, in the judgment of the utility, conditions require the physical protection for the meter installation.

(continued…)

Undoubtedly, to have an unconstitutional delegation of legislative authority, there must be a legislative delegation in the first instance. *Protz* concerned Section 306(a.2) of the Workers' Compensation Act, pursuant to which the General Assembly required the Workers' Compensation Appeal Board to rely exclusively and without discretion on the third-party AMA guidelines. Similarly, *City of Williamsport* concerned Section 11018.13 of the Third Class City Code, which delegated to third-class cities the ability to adopt a standard or nationally recognized maintenance code. The only statutes the Municipalities reference are Sections 501 and 1501 of the Code, neither of which concern gas meters. Pertinently, Section 1501, titled "Character of service and facilities," sets forth safety standards for *public utilities* in the provision of service:

> Every *public utility* shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public.

66 Pa. C.S. § 1501 (emphasis added). Section 501(b) of the Code, on the other hand, concerns the PUC's administrative authority:

> Administrative authority and regulations.—The [PUC] shall have general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth. The [PUC] may make such regulations, not inconsistent with law, as may be necessary or proper in the exercise of its powers or for the performance of its duties.

66 Pa. C.S. § 501(b). Nowhere in these provisions did the General Assembly direct the PUC to choose the location of gas meters in the Commonwealth such that the PUC could have unlawfully delegated that authority to NGDCs in Section 59.18 of its regulations, as the Municipalities so claim. The absence of such a statute sets this case apart from *Protz*, *City of Williamsport*, and the non-delegation doctrine entirely, and further demonstrates

_____

Final Rulemaking Order, 44 Pa. B. at 5835-36.

that NGDCs have the discretion to choose the location of gas meters in the Commonwealth.

Nonetheless, concerned with the safety of the citizens of the Commonwealth, and in recognition of the minimal guidance that former Section 59.18 of its regulations provided as to the location of gas meters, the PUC amended Section 59.18 to, *inter alia*, establish that outdoor gas meter placement is the default location for gas meters in the Commonwealth "[u]nless otherwise allowed or required" by the regulation. 52 Pa. Code § 59.18(a)(1), (8). The PUC provided an exception to the default location where a building is located in a historic district, in which case an inside meter location "*shall be considered*" in conjunction with a number of attendant circumstances. 52 Pa. Code § 59.18(d)(1)(i)-(ii)(D) (emphasis added). There is no allegation in this case that the PUC lacked the *administrative* authority to amend Section 59.18. Thus, at bottom, the Municipalities' non-delegation argument masks their real complaint—*i.e.*, the PUC did not go far enough in Section 59.18 to limit, or direct, NGDCs' placement of gas meters in historic districts. That disagreement, however, does not amount to a non-delegation claim under the circumstances presented here. Accordingly, because this case presents a circumstance that falls outside the realm of the non-delegation doctrine, the Municipalities' claims must fail.[14]

## IV. CONCLUSION

Upon careful review, we conclude that the General Assembly never enacted a statute vesting the PUC with any legislative authority under Article II, Section 1 of the

---

[14] There is also no merit to the argument the Municipalities advanced before the Commonwealth Court that Section 59.18 of the PUC's regulations unlawfully delegates the PUC's administrative authority under Section 501(b) of the Code to NGDCs. Section 59.18 does not vest NGDCs with the authority to regulate *some other entity* concerning the placement of gas meters in historic districts. Section 59.18 merely restricts where NGDCs can place gas meters.

Pennsylvania Constitution relative to the location of gas meters in historic districts that would give rise to any constitutional concerns regarding delegation. Accordingly, we reverse the Commonwealth Court's order granting the Municipalities' Application and remand the matter to the Commonwealth Court for further proceedings consistent with this Opinion.[15]

Chief Justice Todd and Justices Donohue, Dougherty, Wecht and Mundy join the opinion.

---

[15] The PUC did not file a cross-application for summary relief and, therefore, we are constrained to remand the matter rather than grant relief in favor of the PUC.