444 A.2d 1154

**The FIDELITY BANK, as Trustee Under Indenture dated September 1, 1952**

**v.**

**PENNSYLVANIA TURNPIKE COMMISSION, et al., Appellants.**

Supreme Court of Pennsylvania,
Middle District.

Argued Jan. 18, 1982.

Decided May 5, 1982.

82

William S. Rawls, Mollie A. McCurdy, Deputy Attys. Gen., Harrisburg, Louis R. Martin, Harrisburg, for Pa. Turnpike Com'n.

Carleton O. Strouss, Ward T. Williams, Harrisburg, for Dept. of Transp.

Neil W. Burd, Philadelphia, for Peter J. Camiel.

L. E. Myers, Palmyra, for Hon. Roy Bollinger.

Jay H. Calvert, Jr., Philadelphia, for Fidelity Bank.

Edwin P. Rome, Philadelphia, for Jack I. Greenblat.

Before O'BRIEN, C.J., ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

This is an appeal from an order of the Commonwealth Court, dated December 14, 1981, affirming its order of November 13, 1981. That order dismissed as moot a petition for declaratory judgment filed by the Fidelity Bank ("Fidelity") in its capacity as trustee of certain bonds issued by the Pennsylvania Turnpike Commission ("Commission"), seeking

a declaration that the Commission may lawfully conduct business with fewer than three commissioners. The order also mandated the reinstatement to the Commission of Peter J. Camiel, who had been suspended from the Commission on May 5, 1980, by order of the Governor. For the reasons set forth below, we vacate the order of the Commonwealth Court, both as to its direction that Mr. Camiel be reinstated to the Commission and as to its dismissal of the declaratory judgment action as moot.

## I

The Pennsylvania Turnpike Commission was created by the Pennsylvania Legislature through the Act of May 21, 1937, P.L. 774, No. 211, 36 P.S. § 652d, as amended ("the Turnpike Act"), to construct, operate and maintain the Pennsylvania Turnpike system. The 1937 Act and the subsequent enabling acts provide that the Commission is to consist of five members: the Secretary of Transportation, serving ex officio, and four members appointed by the Governor with the advice and consent of two thirds of the Senate. Section 4 of the 1937 Act, 36 P.S. § 652d, further provides:

"Three members of the commission shall constitute a quorum who, for all purposes, must act unanimously. No vacancy in the commission shall impair the right of a quorum of the commissioners to exercise all the rights and perform all the duties of the commission."

Over the years, pursuant to the power granted by section 8 of the Turnpike Act, 36 P.S. § 652h, the Commission has raised funds for the construction of the Turnpike through the issuance of Turnpike Revenue Bonds. Of these issues, bonds in the principal amount of $95,936,000 are presently outstanding. The bonds are secured by a Trust Indenture, dated September 1, 1952, under which the Fidelity Bank acts as trustee for the bondholders. Under the terms of the Indenture, the Commission is required to act from time to time with respect to such functions as the payment of invoices, maintenance of tolls, collection of revenues, award-

ing of construction contracts, obtaining and maintaining insurance policies, and the like. Under section 802(d) of the Indenture, if "the Commission shall for any reason be rendered incapable of fulfilling its obligations hereunder," there exists an "event of default." Section 803 of the Indenture provides that, if an event of default occurs, the trustee "may, and upon the written request of holders of not less than twenty per centum (20%) in principal amount of the bonds then outstanding shall, declare the principal of all bonds then outstanding . . . to be due and payable immediately. . . ." Under section 804 of the Indenture, the trustee may also proceed to protect and enforce its rights and the rights of bondholders through actions or proceedings at law or in equity.

On July 1, 1981, Commissioner Ray M. Bollinger submitted his resignation from the Commission, effective July 31, 1981. At that time, the Commission consisted of three active members: Chairman Jack I. Greenblat, Secretary of Transportation Thomas D. Larson, and Commissioner Bollinger. A fourth member of the Commission, Peter J. Camiel, had been suspended from the Commission by the Governor on May 1, 1980, as a result of Camiel's indictment on criminal charges brought by the United States Attorney for the Eastern District of Pennsylvania. Because it appeared that Commissioner Bollinger's resignation would reduce the voting membership on the Commission to less than the statutory quorum of three members, Fidelity, in accordance with its responsibilities under the Indenture, filed an action for declaratory judgment in the Commonwealth Court on July 20, 1981, together with a motion for an expedited hearing. Named as defendants were the Turnpike Commission and all of its individual members, including Peter J. Camiel. Fidelity asked that the court declare the Commission to be capable of taking valid and legally binding action to operate and maintain the Turnpike upon the unanimous vote of the two remaining voting members.

President Judge Crumlish scheduled a hearing for July 24, 1981. On that date, Commissioner Bollinger, with the ap-

proval of the Governor, withdrew his resignation "until such time as the Legislature returns for the Fall session and takes the necessary action to fill the vacancies on the Commission." At the request of Fidelity, the scheduled hearing was continued indefinitely.

All of the parties named as defendants filed answers. Commissioners Greenblat and Bollinger and the Commission, through its acting chief counsel ("Commission counsel"), joined in Fidelity's request for declaratory judgment. Commissioner Larson, believing that default was not imminent, opposed the granting of a declaratory judgment but requested the court to retain jurisdiction over the action "until such time as a default is clearly anticipated." Mr. Camiel filed an answer alleging that his suspension from the Commission by the Governor was a nullity and asking, by way of new matter, that the court declare it as such. In addition to these answers, the Attorney General, acting as the representative of the Turnpike Commission pursuant to the provisions of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, 71 P.S. §§ 732–101 et seq., filed a motion to dismiss Fidelity's action as moot, contending that the withdrawal of Commissioner Bollinger's resignation extinguished the cause of action.

Chairman Greenblat filed an answer opposing the motion as well as new matter challenging the authority of the Attorney General to represent the Commission and alleging the unconstitutionality of the Commonwealth Attorneys Act, both on its face and in its application to the Commission. Commission counsel filed a petition to intervene on behalf of the Turnpike Commission, joining in Chairman Greenblat's answer and constitutional challenge.[1] Fidelity also opposed the motion to dismiss, arguing that Commissioner Bollinger's

1. At Chairman Greenblat's request, Commission counsel had asked the Attorney General to withdraw his motion to dismiss and allow Commission counsel to supersede the Attorney General and represent the Commission in this action. See 71 P.S. § 732–403(a). When the Attorney General declined to withdraw, Chairman Greenblat directed Commission counsel to intervene on the Commission's behalf. See 71 P.S. § 732–403(b).

withdrawal of his resignation was only temporary and thus did not render the action moot. Mr. Camiel filed an answer contending that, whatever the status of Commissioner Bollinger, the question of the validity of Camiel's suspension should be decided. By way of new matter, Mr. Camiel stated that on August 4, 1981, a judgment of acquittal had been entered on the criminal charges that formed the basis of his suspension. Camiel asked that the Court declare his entitlement to reinstatement to the Commission "with retroactive pay and other emoluments of office from May 21, 1980," the date of his suspension.[2]

The Attorney General filed an answer opposing the granting of Camiel's requested relief on the grounds that the Governor, an allegedly indispensable party, was not a party to the proceedings and that the judgment of acquittal entered by the federal district court after a jury verdict of guilty was not final. The Attorney General also filed an answer in opposition to Commission counsel's petition to intervene, alleging that because a quorum of the Commission had not unanimously approved intervention, Commission counsel was without authority to proceed.

Oral argument on all of the issues raised in the various petitions, motions, answers, and new matters was held on September 25, 1981, before President Judge Crumlish. In an opinion and order filed on November 13, 1981, Judge Crumlish held that Fidelity's action for declaratory judgment had been rendered moot by Commissioner Bollinger's withdrawal

---

**2.** Following a jury verdict of guilty, Judge Clifford Scott Green granted a defense motion for the entry of a judgment of acquittal. See *United States v. Camiel*, 519 F.Supp. 1238 (E.D.Pa.1981). The United States is presently appealing Judge Green's decision to the Third Circuit of the United States Court of Appeals.

On the same day on which the judgment of acquittal was entered, Chairman Greenblat announced his intention to reinstate Mr. Camiel immediately. On August 6 the Attorney General notified the Governor by letter that, in his opinion, the suspension of Mr. Camiel would remain in effect until the Governor acted to lift it. The Attorney General noted that his opinion would have "the full force and effect of law" until a court of competent jurisdiction ruled otherwise. Chairman Greenblat agreed to abide by the Attorney General's opinion.

of his resignation. Judge Crumlish then went on to hold that the judgment of acquittal entered on the criminal charges against Mr. Camiel rendered his suspension a nullity and that Camiel was entitled to immediate reinstatement to the Commission with back pay from May 21, 1980. Judge Crumlish also addressed the dispute over who should represent the Commission, holding that representation by both the Attorney General and Commission counsel was proper and that the Commonwealth Attorneys Act was constitutional both on its face and in its application to the Commission.

Following the entry of the order reinstating Mr. Camiel, Commissioner Bollinger again submitted his resignation from the Commission, effective as of November 30, 1981. On that date, the Attorney General, acting on behalf of the Turnpike Commission, filed a motion for reconsideration of that portion of the November 13 order which directed the reinstatement of Mr. Camiel. In support, the Attorney General pointed out that, contrary to the erroneous view expressed in the court's November 13 opinion, the acquittal of Camiel could be, and in fact was being, appealed by the United States.

All remaining parties filed answers to this motion.[3] Commissioner Larson joined the Attorney General in opposing Camiel's reinstatement. Mr. Camiel maintained that his reinstatement was proper despite the government's pending appeal. Chairman Greenblat and Commission counsel supported the reinstatement of Camiel but urged the court to grant reconsideration of its dismissal of Fidelity's action as moot in light of Commissioner Bollinger's resignation and the continuing challenges to Mr. Camiel's status as a voting member. Fidelity took no position on the court's decision as to Mr. Camiel but joined Chairman Greenblat and Commission counsel in requesting the court to grant the declaratory relief originally sought, reminding the court that a reversal of the decision to reinstate Mr. Camiel would leave the Commission with only two voting members.

**3.** Following his resignation, Commissioner Bollinger took no further part in the proceedings.

On December 14, 1981, the court issued an opinion and order granting the Attorney General's motion for reconsideration and affirming the order of November 13 in its entirety. The court stated that, notwithstanding the government's appeal, the judgment of acquittal served to extinguish the indictments upon which Mr. Camiel's suspension had been based. Commissioner Larson and the Attorney General immediately filed notices of appeal to this Court. At a regular meeting of the Turnpike Commission on December 15, Deputy Secretary of Transportation David Sims, acting on behalf of Commissioner Larson, announced that because the Attorney General's appeal from the order reinstating Camiel worked an automatic supersedeas of that order, Mr. Camiel was not a voting member of the Commission. Sims then stated that the absence of a quorum of three Commissioners rendered the Commission incapable of legally transacting business, whereupon he left the meeting. On the same day, President Judge Crumlish, sua sponte, issued an order that "no appeal filed pursuant to the Order of this Court dated December 14, 1981, shall act as an automatic supersedeas."

On December 18, the Attorney General filed an application for a stay pending appeal with Justice Wilkinson of this Court. The Attorney General argued that public confidence in the integrity of the Turnpike Commission would be harmed by permitting Mr. Camiel to serve on the Commission while his reinstatement was being appealed. Justice Wilkinson referred the matter to the full Court for consideration at oral argument along with the merits of the appeal. Argument was heard on January 18, 1982.

## II

The purpose of the Declaratory Judgments Act is "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations," and, to that end, the act "is to be liberally construed and administered." 42 Pa.C.S. § 7541. In July of 1981, the bondholders of the Pennsylvania Turnpike Commission faced

considerable uncertainty and insecurity because the impending resignation of Commissioner Bollinger would have left the Commission with only two voting members, one fewer than the quorum of three required by statute for the transaction of Commission business. Accordingly, Fidelity Bank, as trustee for the bondholders, availed itself of section 7533 of the Declaratory Judgments Act, which provides: "Any person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . ." Quite simply, Fidelity wished to know, in the interest of the stability and marketability of Commission bonds, whether two members of the Commission could function as three. That question, which has yet to be answered, was ripe for consideration when Fidelity filed its suit in July. It was again ripe when Commissioner Bollinger resubmitted his resignation at the end of November, and would have been decided but for the Commonwealth Court's replacement of that question with the question of Mr. Camiel's right to reinstatement. Because it is manifestly apparent that the court's consideration of Mr. Camiel's new matter worked to increase rather than alleviate the uncertainty faced by Fidelity and its bondholders, we conclude that such consideration was improper and that the court's order directing the reinstatement of Mr. Camiel must be vacated.

When Commissioner Bollinger withdrew his resignation on July 24, 1981, "until such time as the Legislature returns for the Fall session and takes the necessary action to fill the vacancies on the Commission," the court could properly have determined, as it did, that Mr. Bollinger would remain as the third member of the Commission until a new third member was appointed, and that the action for declaratory judgment was therefore moot. See *In re Gross*, 476 Pa. 203, 382 A.2d 116 (1978). If, as in fact happened, Commissioner Bollinger were then to resign before the necessary action was taken to fill the vacancies on the Commission, the court could have proceeded to decide on its merits the question presented by Fidelity. Instead, after dismissing Fidelity's action as moot,

the court, in the interest of "judicial economy," entertained Mr. Camiel's new matter and decided his claim to reinstatement in his favor. As the foregoing procedural history illustrates, the court's decision to address Mr. Camiel's contentions has resulted not in judicial economy but in a myriad of motions and appeals, the perpetuation of uncertainty, and the relegation of Fidelity to the position of spectator in its own lawsuit.

The court's order of November 13 directing the reinstatement of Mr. Camiel and Commissioner Bollinger's subsequent resignation on November 30 placed Fidelity in a virtually impossible position with respect to its action for declaratory judgment. As long as the Commonwealth Court's order reinstating Mr. Camiel remained in effect, the declaratory judgment action would remain moot, despite Commissioner Bollinger's resignation on November 30. Thus, a motion for reconsideration of the dismissal of the action as moot would fail unless the court were to reverse its reinstatement of Mr. Camiel, an issue upon whose merits Fidelity has consistently and understandably taken no position. If the court were to reaffirm its order reinstating Mr. Camiel, the uncertainty from which Fidelity sought relief would of course remain, for reversal or vacation of the order would leave, and indeed has left, only two members on the Commission, with the question of the ability of those two members to transact Commission business yet to be answered.

The court's decision on December 14 to reaffirm its order directing the reinstatement of Mr. Camiel instead of addressing the merits of Fidelity's action also placed the court itself in an impossible position. There could be no question that the decision would be appealed. Indeed, the Attorney General had filed a notice of appeal to this Court even before the Commonwealth Court's decision on whether to grant reconsideration. Pa.R.App.P. 1736(b) states that the taking of an appeal by an officer of the Commonwealth

acting in his official capacity "shall operate as a supersedeas in favor of such party." Under this rule, the Attorney General's appeal would have prevented the order directing the reinstatement of Mr. Camiel from taking effect, thus leaving a two-member Commission of uncertain status, the very situation that Fidelity's action sought to avoid. Apparently to prevent this occurrence, the Commonwealth Court undertook to order, sua sponte, that no appeal should act as a supersedeas, despite the fact that such an order has no basis in our Rules of Appellate Procedure.

Moreover, the order cannot have been of much comfort to the Commission's bondholders, because not only did the possibility remain that the reinstatement of Mr. Camiel could be reversed or vacated on appeal but also the federal government was in the process of appealing the judgment of acquittal entered on the criminal charges against Mr. Camiel. Indeed, even if this Court were to address the merits of Mr. Camiel's claim to reinstatement and decide in his favor, the uncertainty from which Fidelity seeks relief on behalf of its bondholders would not be dispelled, for the appeal from the judgment of acquittal has yet to be decided. If that judgment should be reversed on appeal and the jury verdict of guilty reinstated, Mr. Camiel would be subject to automatic removal from the Commission pursuant to Article VI, section 4 of the Pennsylvania Constitution, see *McSorley v. Pennsylvania Turnpike Commission*, 390 Pa. 81, 134 A.2d 201 (1957); *Commonwealth v. Davis*, 299 Pa. 276, 149 A. 176 (1930), and, absent a new appointment, the Commission would be returned to the same uncertain two-member status that Fidelity has sought since July of 1981 to avoid.

Thus it is apparent that, far from effectuating the purpose of the Declaratory Judgments Act to "afford relief from uncertainty," the Commonwealth Court's consideration of Mr. Camiel's claim to reinstatement in the context of Fidelity's action for declaratory judgment has in fact compounded uncertainty. Because Mr. Camiel's claim should

never have been addressed in this action, the order directing his reinstatement is vacated.[4]

### III

■ As to the question of the respective rights of the Attorney General and Commission counsel to represent the Commission in this litigation and the concomitant challenge by Commission counsel to the constitutionality of the Commonwealth Attorneys Act, we agree with the determination of the Commonwealth Court that the act is constitutional and that both attorneys may participate in the proceedings.

As Commission counsel concedes, section 204(c) of the Commonwealth Attorneys Act, 71 P.S. § 732–204(c), gives the Attorney General both the right and duty to assume the representation of the Turnpike Commission when it has been sued. Section 403 of the act, while permitting the Attorney General to delegate that duty to agency counsel upon request, in no way affects the continued right of the Attorney General to represent the agency if he so chooses.[5] The concluding language of § 403(b) makes this clear by providing that the Attorney General shall "*continue* to represent the Commonwealth" when agency counsel intervenes. The preceding sentence, which states that the agency counsel shall be obligated to represent the agency when the right of

4. Our vacation of the order of reinstatement in no respect precludes Mr. Camiel from proceeding to challenge his suspension in an appropriate manner.

5. Section 403 provides:

(a) Representation of agency by agency counsel.—When ever any action is brought by or against any independent agency or independent agency official, the agency head may request in writing, setting forth his reasons, the Attorney General to authorize the agency counsel to supersede the Attorney General and represent the agency or its official.

(b) Intervention by agency counsel.—If the Attorney General does not grant the request, the agency head may authorize the agency counsel to intervene in the litigation. Such intervention shall be a matter of right and when exercised, confer upon the agency counsel the obligation to represent the agency. The Attorney General shall at all times continue to represent the Commonwealth.

71 P.S. § 732–403.

intervention is exercised, speaks only to the duty of the agency counsel as intervenor, not to the position of the Attorney General in the litigation. Thus it is apparent that section 403(b) does not compel the ouster of the Attorney General when agency counsel intervenes. Rather, the act contemplates the possibility of dual representation where the Attorney General and the members of an agency disagree as to the agency's interests or where, as here, the members of an agency are themselves unable to agree upon the agency's interests and the Attorney General disagrees with the agency's chairman. Accordingly, we reject the claim of Commission counsel that his intervention bars the Attorney General from representing the Commission in this litigation.

We likewise reject the Attorney General's argument that Commission counsel may not properly intervene because his intervention was not authorized by a unanimous quorum of three commissioners. Although the Turnpike Act does indeed require that a quorum of three commissioners "for all purposes, must act unanimously," 36 P.S. § 652d, nowhere does the act speak to the "purpose" of appointing counsel to represent the Commission in litigation. On the other hand, section 403(b) of the Commonwealth Attorneys Act specifically authorizes an agency chairman to direct agency counsel to petition to intervene in litigation involving the agency in which the Attorney General has refused to allow himself to be superseded.

Under the Statutory Construction Act, "[w]henever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both." 1 Pa.C.S. § 1933. Here, it is reasonable to assume that "all purposes" for which a quorum of three commissioners must act unanimously refers only to purposes enumerated in the Turnpike Act. As the authorization of Commission counsel to represent the Commission is not such a "purpose," Chairman Greenblat could properly direct Commission counsel to petition to intervene, pursuant to section 403(b) of the Commonwealth Attorneys Act.

■ Commission counsel's challenges to the constitutionality of the Commonwealth Attorneys Act are unworthy of extended discussion. We agree with the Commonwealth Court that the Act does not violate the prohibition of article III, section 3 of the Pennsylvania Constitution against the passing of bills containing more than one subject. We also agree that Commission counsel's speculative argument that the Act permits the Attorney General to delay or impair Commission contracts does not begin to satisfy the heavy burden which rests upon a "party seeking to upset legislative action upon constitutional grounds." *Milk Control Commission v. Battista*, 413 Pa. 652, 659, 198 A.2d 840, 843 (1964). See *Daly v. Hemphill*, 411 Pa. 263, 271, 191 A.2d 835, 840 (1963) ("an Act of Assembly will not be declared unconstitutional unless it *clearly, palpably*, and *plainly* violates the Constitution").

## IV

■ We turn finally to the status of Fidelity's action for declaratory judgment. With the resignation of Commissioner Bollinger and our vacation of the order reinstating Mr. Camiel, there remain only two voting members of the Commission. Thus the question of the power of those two members to conduct Commission business is no longer moot but rather ripe for decision. The merits of Fidelity's action, however, have not been addressed by the Commonwealth Court, which dismissed the action as moot, nor have they been argued to this Court. Accordingly, we vacate the order of the Commonwealth Court dismissing the action as moot and remand to that court for an expedited hearing on the merits.

There remains only the question of the status of the two-member Commission during the pendency of Fidelity's action. In *McSorley v. Pennsylvania Turnpike Commission*, 390 Pa. 81, 134 A.2d 201 (1957), where this Court upheld the right of the Governor to suspend a member of the Turnpike Commission for cause, we considered the possibility that the

membership of the Commission might fall below the quorum of three required to transact Commission business. There this Court stated:

"In any event, the law will not be found powerless to protect, manage, and operate the properties of the Turnpike Commission, pending suspension of Commissioners, if the number suspended should at any time be such as to deprive the Commission of a quorum of its members—a situation with which we are not now confronted. See, e.g., *Dalzell v. Kane*, 321 Pa. 120, 123, 183 A. 782."

Id., 390 Pa. at 89, 134 A.2d at 205. Now that the situation contemplated in *McSorley* is a reality, it is imperative that the Commission be protected from the possibility of defaulting on its bonds while Fidelity pursues its action for declaratory judgment in the Commonwealth Court. Fidelity suggests that we direct the Commonwealth Court to appoint a provisional third voting member to the Commission until the question of a quorum is resolved. We prefer, however, to adopt a narrower remedy, one tailored specifically to Fidelity's interest in safeguarding the stability and marketability of the Commission's bonds. Accordingly, we decree that, until such time as the Commonwealth Court renders a decision on the merits of the petition of the Fidelity Bank for declaratory judgment, or until such time as a third voting member shall have been properly seated upon the Commission, the two remaining members of the Pennsylvania Turnpike Commission may, by unanimous vote, lawfully transact such Commission business as is necessary to prevent the occurrence of an event of default, as defined in section 802 of the Trust Indenture dated September 1, 1952.

The order of the Commonwealth Court is vacated insofar as it dismisses as moot the petition of Fidelity Bank for declaratory judgment and directs the reinstatement of Peter J. Camiel to the Pennsylvania Turnpike Commission. That portion of the order of the Commonwealth Court which upholds the constitutionality of the Commonwealth Attorneys Act as applied to the Turnpike Commission is affirmed.

Record remanded for proceedings consistent with this opinion.

NIX and McDERMOTT, JJ., file dissenting opinions.

NIX, Justice, dissenting.

The Commonwealth Court's consideration of the legality of the suspension of Commissioner Peter J. Camiel, by order of the Governor, was necessary to determine whether Fidelity's Action for Declaratory Judgment should be entertained. The majority's failure to recognize the significance of that question and its relationship to the problem raised in the instant appeal, caused them to reach a result with which I cannot agree. I therefore dissent.

The Uniform Declaratory Judgments Act of June 18, 1923, P.L. 840, empowered courts to grant relief by declaratory judgment in all civil cases where "an actual controversy exists between contending parties . . . ." Section 6 of the Act of 1923.[1] In the Act of July 9, 1976, P.L. 586, No. 142, § 2 entitled Declaratory Judgments Act, 42 Pa.C.S. § 7531 et seq., which replaced the Uniform Declaratory Judgments Act of 1923 provides in pertinent part:

Remedy discretionary

The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate *the uncertainty or controversy giving rise to the proceeding*, but as provided in Section 7541(b) (relating to effect of alternative remedy) the existence of an alternative remedy shall not be a ground for the refusal to proceed under this subchapter.

42 Pa.C.S. § 7537 (Emphasis added).[2]

1. The requirement of an *actual* controversy was relaxed to include "the ripening seeds" of controversy by Mr. Chief Justice Moschzisker in *Kariher's Petition (No. 1)*, 284 Pa. 455, 471, 131 A. 265, (1925) (wherein the Act of 1923 was held to be constitutional).

2. See, Official Source Note of Pa.C.S. § 7537 indicating the section is "derived from Act of June 18, 1923 (P.L. 840) § 6 as originally enacted."

The inclusion of the clause "the uncertainty or controversy giving rise to the proceeding" clearly indicates that the *existence* of such a controversy or uncertainty is a primary and dominant factor, and as such a threshold question, in a courts "discretionary determination of whether a declaratory judgment will lie...."[3] Thus, under the new Declaratory Judgments Act as well as under the former Uniform Declaratory Judgments Act, an actual controversy or an uncertainty (synonymous with "ripening seeds of controversy") is required for the action to lie.

The enactment of the present Declaratory Judgments Act did not authorize courts to render advisory opinions, to decide future rights in anticipation of an event which may not happen, or to consider moot cases. Moreover, this Court has been firm in its disapproval of the practice of rendering advisory opinions. *Mt. Lebanon v. County Board of Elections of the County of Allegheny*, 470 Pa. 317, 368 A.2d 648 (1977); *Packel v. Takiff*, 457 Pa. 14, 321 A.2d 649, (1974); *Raezer v. Raezer*, 428 Pa. 163, 236 A.2d 513 (1968); *Bliss Excavating Company v. Luzerne County*, 418 Pa. 446, 211 A.2d 532 (1965); *Stahl v. Insurance Co. of N. A.*, 408 Pa. 483, 184 A.2d 568 (1962); *Phila. v. P.T.C.*, 404 Pa. 282, 171 A.2d 768 (1961); *Pa. R.R. v. P.U.C.*, 396 Pa. 34, 152 A.2d 422 (1959); *Knup v. Phila.*, 386 Pa. 350, 126 A.2d 399 (1956); *Schoenbrun v. Nettrour*, 360 Pa. 474, 61 A.2d 868 (1948); *Kariher's Petition (No. 1)*, 284 Pa. 455, 131 A. 265 (1925).

In the instant case, when Fidelity Bank filed its Action for Declaratory Judgment, only the impending effectiveness of Commissioner Bollinger's resignation *together* with the inactivity of Commissioner Camiel because of a lawful suspension from the position by the Governor could produce the ripening seeds of controversy needed to sustain an action for declaratory judgment. Both factual circumstances must be lawfully as well as actually present in order for the Fidelity

---

**3.** *Friestad v. Travelers Indemnity Co.*, 452 Pa. 417, 306 A.2d 295 (1973), incorporated into section 7537, suggests the consideration of factors in the "discretionary determination of whether a declaratory judgment will lie."

Bank to establish the type of uncertainty or controversy contemplated by the Act.

After the final resignation of Commissioner Bollinger, three Commissioners remained members of the Turnpike Commission: Chairman Jack I. Greenblatt, Secretary of Transportation Thomas D. Larson and Commissioner Peter J. Camiel. There are no impediments to the activities of the Commission's Chairman and the Secretary of Transportation. The issue of whether there exists a lawful impediment to the activities of Commissioner Camiel is a *sine qua non* to the resolution of the threshold question of the existence of an actual controversy or uncertainty. Unless Commissioner Camiel is *presently* in a lawfully suspended status, the Turnpike Commission has the statutorily mandated quorum and the complaint of Fidelity Bank is moot. It is the critical question which the majority seeks to avoid.

The Commonwealth Court correctly recognized that the status of Commissioner Camiel had to be determined before a judgment could be made whether there was such a controversy or uncertainty to warrant entertaining the petition for declaratory judgment. Had the suspension of Commissioner Camiel remained uncontested there may have been justification for assuming its effectiveness based upon the presumption of the lawfulness of the action of the Governor. Cf., *Stroup v. Kapleau*, 455 Pa. 171, 177, 313 A.2d 237, 240 (1973). However, the legitimacy of that suspension was challenged in the Commonwealth Court and that challenge *could not be ignored.*

The Commonwealth Court correctly raised that issue, concluded that Mr. Camiel was entitled to be a member in good standing on the Commission and reached its ultimate conclusion that the issue was not ripe for declaratory judgment. It is improper for this Court to challenge the ultimate decision of the Commonwealth Court without first examining the validity of its determination as to Mr. Camiel's status. This the majority declined to do. On the contrary, they ignored the issue which was critical in determining whether the Commonwealth could properly exercise its jurisdiction in reaching the merits of the controversy.

In an attempt to justify the avoidance of the question presented, it is argued that the Governor was an indispensible party. This argument cleverly equates a determination of the ripeness of the cause for a declaratory judgment with a proceeding in the nature of a request for reinstatement of Mr. Camiel. The issue is not whether the Commonwealth Court had the power in that action to reinstate Mr. Camiel, but rather a determination of his status for purposes of deciding whether in fact the controversy was ripe. The majority's attempt to implicitly insist upon a formal reinstatement proceeding before the question of the status of Mr. Camiel could properly be considered is a thin facade to cover the absence of the critical fact required before a court should entertain an action for declaratory judgment.

I am totally at a loss to understand the majority's statement that the consideration of Mr. Camiel's status created uncertainty and, therefore, should not have been addressed. It is undeniable that if at the time the lawsuit was before the court there were three members of the Commission legally entitled to participate in the Commission's business, then the question sought to be clarified had no existence in reality. Restated, there would have been no controversy or uncertainty to be resolved. To presume the uncertainty as the majority seeks to do on the pretext of avoiding uncertainty is not only absurd but it also nullifies the clear purpose of § 7537.

I *also* do not understand the jurisprudential underpinnings for the majority's imprimatur to the legitimacy of the action of two members of the Commission, while the merits of that very question are to be *initially* considered in the Commonwealth Court. If the majority is of the view that the issue was so clear that it does not require further study and consideration, then valuable judicial time is being squandered by allowing the Commonwealth Court to wrestle with an issue that the majority now sees so clearly. On the other hand, if there is a serious question as to the statutory authority for two members to bind the Commission, I am at

a lost to determine the source of this Court's authority to grant that power even on an interim basis.[4]

Thus, I cannot agree with the majority's initial failure to decide the status of Mr. Camiel. Nor can I comprehend the basis for this Court's authorization of two members acting for the Commission pending the determination as to whether or not the legislature has provided such authority.

In summary, we should have first considered the merits of the Commonwealth Court's conclusion that Mr. Camiel was at this point and time entitled to serve as a member of the Commission. If after such consideration we concurred in that judgment, then we would have been required to accept the conclusion that the issue sought to be decided by way of declaratory judgment was not ripe for consideration. If we had reached the conclusion that Mr. Camiel was still in a suspended status, we would under the circumstances have had two alternatives. We could, as the majority does today, remand the question as to whether or not two members can bind the Commission where there are not three or more members capable of functioning. However, by deferring that decision, we would be precluded from authorizing the two members to act until the issue was ultimately resolved. The other alternative, which I believe would then have been more appropriate, would have been for us to reach the merits of that question and to have provided a definitive answer.

McDERMOTT, Justice, dissenting.

This case is sufficiently complicated by the expected human vagaries that infect all institutions of government and otherwise. It should breed no further anomalies. The

---

4. The majority rips a platitude ("The law will not be found powerless ...") from *McSorley v. Pa. Turnpike Commission*, 390 Pa. 81, 89, 134 A.2d 201, 205 (1957) to vest in this Court the power to restructure a statutory creature in disregard of the statutory mandate for the operation and management of that body. That platitude referred to in *McSorley* was derived from our decision in *Danzell v. Kane, et al.*, 321 Pa. 120, 123, 183 A. 782, 784 (1936) wherein it was clear that it did not apply to conditions precedent to the exercise of a jurisdiction, which is exactly what is involved here.

Turnpike Commission is without members sufficient to constitute a quorum. This deficiency is caused by the suspension of one member and the resignation of another. In this vacuum, the Fidelity Bank, as trustee of Turnpike bonds, seeks by Declaratory Judgment to know whether two members of the Commission may act in place of three. The matter came first before the Commonwealth Court. There, two things were determined: first, that the suspended member be reinstated and second, that the case was moot because the member who resigned withdrew his resignation and therefore, a quorum existed. That is, it existed for a few days until the member re-resigned and the status of the reinstated member was placed under attack by appeal of this Court.

If the suspended member was improperly reinstated, there is no quorum; if not, there is a quorum. The majority opinion finds, and I agree, that to determine that question, the Governor, whose action suspended the member, must be a party to these proceedings. He is not and that question cannot be answered now. The majority opinion then takes a step I do not believe we are entitled to take. They authorize two members to be a quorum when the statute mandates three. See 36 Pa.C.S.A. § 652d. While I have no doubt that extraordinary occasions invest this Court with extraordinary power, this case has a factitious ring of impending calamity. The Legislature, with swift powers of resolution at hand, seems unperturbed. It can fulfill the requirements of the statute it created. Whatever its reasons may be for not doing so, the responsibility is clearly that of other branches of government. For this Court to rewrite a statute and invest two Commission members with a power their creators did not give them, is to my mind an exercise in judicial statute writing that we ought not indulge, nor be required to do, while a viable Legislature exists.

The calamities foretold may wake the sleeping giant. Our alarm should be the very last. This is not to shuffle responsibility, or for technical reasons to allow the turnpike to sink into the earth, but rather to maintain the integrity and

responsibility of the separate branches. They have their duties, we have ours. We should not do what they can so plainly do without the gravest reasons.