Honorable Thomas D. Larson, as Secretary of Transportation of the Commonwealth of Pennsylvania, and as a member ex officio of the Pennsylvania Turnpike Commission, Petitioner *v.* Pennsylvania Turnpike Commission et al., Respondents.

324

Argued November 28, 1984, before President Judge CRUMLISH, JR. and Judges WILLIAMS, JR. and COLINS, sitting as a panel of three.

*Spencer A. Manthorpe,* Chief Counsel, with him, *Robert W. Cunliffe,* Deputy Chief Counsel, and *Carleton O. Strouss,* Assistant Counsel, for petitioner.

*Louis R. Martin,* Chief Counsel, with him, *Kevin F. Longenbach,* Assistant Chief Counsel, and *Jacqueline M. Verney,* Assistant Chief Counsel, for respondent, Pennsylvania Turnpike Commission.

*Harvey A. Sernovitz,* for respondent, Honorable Jack I. Greenblat.

*Richard A. Sprague,* with him, *M. Richard Komins* and *William K. Doak, Sprague, Levinson & Thall,* for respondent, Honorable Peter J. Camiel.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., December 5, 1984:

Petitioner Thomas D. Larson, as Secretary of Transportation and as an *ex-officio* member of the Pennsylvania Turnpike Commission (Commission), and respondents, the Commission and Commissioner Peter J. Camiel, by cross-motion request summary judgment on Secretary Larson's petition for review in the nature of a complaint in equity seeking to en-

join the Commission and Commissioner Camiel from hiring any personnel, paying any personnel hired on or after February 7, 1984, or paying any bills incurred by the Commission without first obtaining the affirmative vote of at least three sitting Commissioners.[1]

As the material facts are well-developed and undisputed by the parties, it is appropriate for us to grant summary judgment to whomever is so entitled as a matter of law. *Scheetz v. Borough of Lansdale,* 64 Pa. Commonwealth Ct. 24, 438 A.2d 1048 (1982). More importantly, it is incumbent upon us to promptly resolve this matter, as further delay might jeopardize the security to which the Commission's bondholders, the citizens of this Commonwealth and the users of the turnpike system are entitled. For the reasons to follow, we grant the Commission's and Commissioner Camiel's motion for summary judgment and deny Secretary Larson's motion for summary judgment.

### PROCEDURAL AND SUBSTANTIVE HISTORY

This controversy developed in October 1983, when, due to vacancies within the Commission's membership, the surviving members could not by a majority vote agree on the procedure by which the affairs of the Commission would be conducted. Specifically in dispute were the hiring of personnel and the payment of obligations due and owing on contracts previously approved by the Commission. This impasse, in time, became so intractable that by early 1984 total ineffectiveness of the Commission threatened its viability.

---

[1] At the time Secretary Larson filed his complaint, the Commission had only three of its statutory complement of five members. *See* Section 4 of the Turnpike Act, Act of May 21, 1937, P.L. 774, 36 P.S. §652d. As of this time, four Commissioners are now seated.

The disruptive consequences of this state of its affairs gave rise to the extraordinary conduct of which petitioner now complains.

Chairman Jack I. Greenblat,[2] responding to the dual crises of inadequate manpower and non-payment of debt and only after the conclusion of yet another unproductive Commission meeting, directed the hiring of temporary employees and the payment of all bills then outstanding. In support of this unilateral action, Chairman Greenblat stated:

> I consider this situation to be intolerable to the Commission, to the staff, to the bondholders, to the Trustee, people to whom we owe money. At my direction, the Chief Counsel has reviewed the authority of the position as Chairman in the Enabling Act, The Trust Indenture, The Rules and Regulations for the Governing of the Commission, and the history of the Commission's delegation of various operational functions. He has determined that I, as Chairman, have sufficient authority to order the immediate payment of all bills and the hiring of employees on a temporary basis to aleviate [sic] this emergency situation and maintain appropriate effeciency [sic] in accordance with toll road standards. It is my best business judgment that this action must be taken. . . .[3]

With the Commissioners' deadlock evidently not having been resolved by their next meeting on February 28, 1984, Chairman Greenblat pursued his earlier course by ordering the payment of approximately $2,500,000 in outstanding Commission bills.[4]

[2] Chairman Greenblat resigned his seat on the Commission this past April; he remains, however, one of the named respondents in this action.

[3] Minutes of Commission meeting held February 7, 1984, p. 70.

[4] Minutes of Commission meeting held February 28, 1984, p. 72.

The Commission's Executive Director and Comptroller, in compliance with Chairman Greenblat's directions, hired temporary employees, paid the salaries of these employees, and paid the bills then due.

On March 5, 1984, Secretary Larson filed this complaint seeking to preliminarily enjoin these actions. On March 8, 1984, we held an expedited hearing on this motion, and on August 28, 1984, by Opinion and Order we denied the Secretary's motion for preliminary injunction.

In the interim, the office of Commission Chairman became vacant when Chairman Greenblat resigned.[5] Reorganization of the Commission by the election of officers, on motion of Secretary Larson's designated representative, was deferred until a fourth member should qualify.[6]

Following our August 28, 1984 Order and Opinion denying preliminary injunctive relief, Commissioner Camiel, asserting his authority as Vice-Chairman pending reorganization and the election of a Chairman, pursuant to paragraph 7 of the Rules and Regulations for the Government of the Commission (rules and regulations),[7] directed the hiring of personnel to alleviate shortages deemed "critical" by the Com-

---

[5] Commissioner James J. Dodaro assumed his duties at the April 4, 1984 Commission meeting; as Chairman Greenblat's term had expired and he had continued in his duties only until a new Commissioner took his seat, he resigned from the Commission at that time.

[6] Minutes of Commission meeting held April 4, 1984, p. 2.

[7] The Commission passed these rules and regulations by resolution dated January 23, 1978. Paragraph 7 states:

The Vice Chairman shall perform the duties and exercise all the functions of the Chairman in his absence, or during his inability to act, or during a vacancy in the Office of the Chairman. Performance by a Vice Chairman of any of the duties of the Chairman shall, as to third parties, be conclusive evidence of his authority to act in any

mission's Executive Director.[8]   Commissioner Camiel also directed the deletion of certain items from the Commission's agenda which he deemed unnecessary by his interpretation of our August 28, 1984 Opinion and Order.

Challenging Mr. Camiel's directives, Secretary Larson then filed a motion in this Court seeking special injunctive relief.   We denied this motion by Order dated September 5, 1984 and scheduled a September 7, 1984 hearing on the Secretary's motion for a preliminary injunction.   The Secretary applied to our Supreme Court for the identical relief.

Recognizing that the issue had not been resolved in this Court, our Supreme Court issued an interim Order on September 12, 1984, delineating Commissioner Camiel's authority pending disposition of the case on its merits[9] and, by further order dated November 5, 1984, instructed us to resolve the issues by decision within thirty days.

---

such respect.   The Vice Chairman shall have such other powers and perform such other duties as may be assigned to him by the Commission, or the regulations.

[8] Letter from James B. Wilson, Commission Executive Director, to Joseph E. Egan, Vice President for Corporate Banking, Fidelity Bank, dated August 20, 1984.

[9] The Supreme Court's Order provided, in pertinent part:

(1) Pending appellee Commission's reorganization with all its duly appointed members, its Vice Chairman is authorized to pay bills of the appellee Commission incurred and due and payable in the ordinary and routine course of its operation, upon proper vouchers therefor, unless such bill or bills are disapproved by vote of three Commission members.   Upon reorganization, the Commission's duly elected chairman is so authorized.

(2) The Vice Chairman is enjoined from hiring personnel except replacements for vacancies within its complement which remain or have remained unfilled for lack of three Commission votes for more than one meeting, which

## THE CHAIRMAN'S AUTHORITY

Secretary Larson contends that at least three affirmative votes in support of *all* Commission motions are required to authorize execution and that the Chairman may not individually execute Commission business. This contention we construe to mean that, in addition to the purely ministerial decisions he makes, the Chairman is without authority to address and resolve policy differences as well.

The Secretary relies on Section 4 of the Turnpike Act, which provides in part: "Three members of the commission shall constitute a quorum who, for all purposes, must act unanimously. No vacancy in the commission shall impair the right of a quorum of the commissioners to exercise all of the rights and perform all of the *duties of the commission.*" (Emphasis added.) In addition, Secretary Larson urges that our Supreme Court's decision in *Fidelity Bank v. Pennsylvania Turnpike Commission,* 498 Pa. 80, 444 A.2d 1154 (1982), stands for the proposition that a three-Commissioner affirmative vote is a prerequisite to any Commission action. The respondents, however, argue that the ordinary business functions of the Commission may be executed by the Chairman pursuant to the authority vested in him as the Commission's acting chief executive officer. They argue further that the

are deemed critical by the Executive Director on certification of critical need by professional staff. The Vice Chairman's authority to hire replacements to fill such vacancies which may occur in critical positions may be countermanded by vote of three members of the Commission. The Commission's Chairman, when elected, shall succeed to the hiring authority here granted the Vice Chairman.

(3) The Vice Chairman is enjoined and restrained from acting to change, remove or delete financial or personnel matters from the agenda for Commission meetings in a manner contrary to pre-existing commission practice.

Chairman is empowered to act in execution of all decisions which must be made in the course of the ordinary and usual business affairs of the Commission. Reliance is placed upon paragraph 6 of the rules and regulations, which provides:

> The Chairman shall preside at all meetings at which he shall be present. *He shall be the Chief Executive Officer and shall have general charge and supervision and authority over all of the business and affairs of the Commission.* He shall perform such other duties as are incident to his office, or as are properly required of him by the Commission, and by the regulations, subject to the provisions of any Trust Indentures that may have been or may be executed by the Commission. (Emphasis added.)

Respondents urge that the Vice-Chairman, as the Commission's current chief executive officer, must be viewed as the designated person responsible for the continued and efficient conduct of the Commission's business and affairs.

We reject Secretary Larson's interpretation of the language of Section 4 of the Turnpike Act. This language simply cannot be reasonably construed to evince legislative intent that each and every Commission act must be supported by an affirmative vote of three Commissioners, nor does it so imply. Section 4 simply requires the election of a Chairman and the prescription of Rules and Regulations regulating his function. His executive duties include but are not limited to such executory functions as are by Rule and Regulation ordained to effectuate the will of the Commission as expressed by formal parliamentary procedural action. For instance, a Commission decision as to whether to widen the turnpike or authorize an extension or the appropriate funding of the same

would require a determination by the Commission in body. But, on the other hand, where the Commission has previously authorized a major project or has established policy, and all that need be done is to accomplish the purposes of the decisions, these responsibilities of execution rest with the Chairman in his capacity as its chief executive officer.

The Commission's rules and regulations designate the Chairman as chief executive officer and vest in him "general charge and supervision and authority over all of the *business* and affairs of the Commission. . . ." (Emphasis added.) Since the Commission has chosen in its rules and regulations to designate the Chairman its "Chief Executive Officer," we must give to that designation its ordinary and commonly-accepted usage, and with it go the powers and responsibilities ordinarily delegated to it. We now determine the extent and the scope of this authority in the unique circumstances presented by this Commission's current impasse.

It cannot be overemphasized that the issue at hand concerns the Chairman's authority to manage this Commission in the midst of a situation unparalleled in its history, namely, the seemingly hopeless inability of the Commissioners to reach an effective consensus, at the least, on most of the sundry items of business heretofore passed upon by them.

Rather than lending support to Secretary Larson's argument, our Supreme Court's decision in *Fidelity Bank* illustrates how tradition must yield to necessity when an emergency presents itself. In *Fidelity Bank,* the trustee for the Commission's bondholders sought a declaratory judgment that the Commission may conduct its business on the authority of two sitting Commissioners. There, the vacancy of three Commission seats threatened the continued fulfillment

of the Commission's obligations to the bondholders, and thus the viability of the bonds themselves.[10] Notwithstanding the Turnpike Act's written requirement that the Commission's actions be supported by at least three votes, our Supreme Court, invoking its earlier vow that "the law will not be found powerless to protect, manage, and operate the properties of the Turnpike Commission,"[11] granted extraordinary relief by decreeing that during the pendency of that crisis the vote of the two sitting Commissioners would properly authorize the Commission's continued fulfillment of its obligations.

Although the circumstances of the Commission's current crisis differs from *Fidelity Bank,* we foresee the resurfacing of the same devastating consequences which threatened the *Fidelity Bank* bondholders should we hold that they are completely at the mercy of a functionally-paralyzed Commission. Interests more fundamental to our citizens are also threatened. Prior to the intervention of former Chairman Greenblat and later Vice-Chairman Camiel, the deadlock on the Commission had led to critical shortages of emergency medical technicians, radio operators, and toll collectors, which would have soon resulted in "disruption of traffic and consequent safety to the (turnpike's) patrons."[12] Similarly, a huge backlog of unpaid bills, owing and threatening the stability of the creditors, has severely endangered the Commission's

---

[10] Under Section 802(d) of a 1952 Trust Indenture executed by the Commission for the benefit of its bondholders, a default occurs in the Commission's bonds if it "shall for any reason be rendered incapable of fulfilling its obligations" to the bondholders. This Indenture is still in effect.

[11] *McSorley v. Pennsylvania Turnpike Commission,* 390 Pa. 81, 89, 134 A.2d 201, 205 (1957).

[12] Memo from James B. Wilson, Commission Executive Director, dated August 6, 1984.

ability to contract for the safe maintenance of the turnpike.

Despite the seating of a fourth member in September,[13] the Commission continues in impasse to this writing and has yet to be reorganized.

### COMMISSIONER CAMIEL'S CURRENT STATUS

Secretary Larson maintains that Commissioner Camiel is without authority to perform the powers and duties of the Chairman during the present vacancy in that office. The Commission and Commissioner Camiel counter by asserting that such authority does rest in him by virtue of his elected position as Vice-Chairman.

Initially, the Secretary, contending that the Turnpike Act fails to designate Vice-Chairman as one of the offices created by it,[14] argues that this omission voids the Commission's creation of this office by rule or regulation. This argument might have merit if the language of the enabling legislation expressly proscribed the creation of additional offices. No such restriction exists. In fact, the legislature has expressly granted the Commission the right to structure its governmental hierarchy. Section 4 of the Act provides in part that " [t]he commission shall make necessary rules and regulations for its own government. . . ." We read this provision to authorize the Commisison to provide for a Vice-Chairman to fulfill the Chairman's function in his absence or in the event of a vacancy in that office. This is plainly indispensable

---

[13] Commissioner Frank A. Ursomarso assumed his duties at the Commission meeting on September 10, 1984.

[14] Section 4 of the Act provides that "[t]he commission shall elect one of the appointed members as chairman of the commission, and shall also elect a secretary and treasurer who may not be a member of the commission."

to the continuing discharge of the Commission's vital responsibilities.

Secretary Larson's next contention relates to the legislation formerly known as the Commonwealth Documents Act.[15] He argues that the Commission's 1978 rules and regulations (repealing the Rules and Regulations adopted in 1967 which established the office and authority of the Vice-Chairman)[16] providing for the Vice-Chairman's office are void since they were not promulgated pursuant to prescribed legislative procedure.[17] This argument is self-defeating because their efficacy is preserved since the Commonwealth Documents Act postdated the adoption of the virtually identical 1967 rules and regulations.

Finally, Secretary Larson argues that the office of Vice-Chairman is now vacant by operation of the Commission's own rules and regulations. He relies on a passage from paragraph 5 of the rules and regulations, which provides:

[W]henever there is any change in the members of the Commission, then at the first regular

---

[15] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§1102-1602. The statutory title "Commonwealth Documents Act" was repealed by Section 7 of the Act of July 9, 1976, P.L. 877.

[16] Paragraph 7 of these rules and regulations states:

The Vice Chairman shall perform the duties and exercise all the functions of the Chairman in his absence, or during his inability to act, or during a vacancy in the Office of the Chairman. Performance by a Vice Chairman of any of the duties of the Chairman shall, as to third parties, be conclusive evidence of his authority to act in any such respect. The Vice Chairman shall have such other powers and perform such other duties as may be assigned to him by the Commission, or the Chairman, or the regulations.

[17] The specific sections allegedly violated deal with approval of a regulation's legality (45 P.S. §1205), publication in the Pennsylvania Bulletin (45 P.S. §1201), and the depositing of a regulation with the Legislative Reference Bureau (45 P.S. §1208).

meeting held by the Commission after a new member or members have entered upon their duties, such change of membership shall operate to create vacancies in each of the aforesaid offices, *and proper persons shall be elected to fill the vacancies at the said regular meeting.* (Emphasis added.)

The Secretary thus maintains that the Commission's offices have been vacant since the seating of the new Commissioner in April. This argument conveniently ignores an earlier portion of the same paragraph, wherein it is provided that the Commission's officers (including the Vice-Chairman) ''shall hold their respective offices until their successors are duly elected and qualified.'' We must presume that the Commission intended that these two provisions be given effect without contradicting the other, since they were approved simultaneously by it. Therefore, we read paragraph 5 to mean that the seating of a new Commissioner vacates the offices *only* when there is reorganization and election of new officers. If we agree with the Secretary's interpretation, we would allow the Commission to drift aimlessly in unchartered water with no port in sight and no captain to direct it. If the Commission cannot agree on routine mundane issues, how can one reasonably expect interested third parties to have confidence that the Commission is capable of accomplishing the comprehensive objective expressly provided in the legislation which created it.[18] Accordingly, we hold that until such time as the Commission successfully reorganizes through the election of new officers, Commissioner Camiel as

---

[18] The legislature has charged the Commission with the responsibility for constructing, maintaining, and operating the statewide turnpike system. *See* Section 4 of the Turnpike Act, 36 P.S. §652d. *See* note 19 *infra* for a detailed recitation of the Commission's powers attendant to these duties.

the Commission's duly-elected Vice-Chairman possesses all the powers and duties of his office as well as those which are ordinarily and customarily delegated to the Chair, including the emergency authority we herein prescribe.

It is vital that the management of the turnpike system continue despite the present deadlock among the Commission members. We therefore hold that, until the impasse is broken, Vice-Chairman Camiel has the authority to unilaterally issue directives necessary to (1) the continued unimpeded daily operation of the turnpike system, including the hiring of needed personnel in positions provided for by the Commission, (2) the payment of monies owing on obligations approved by the Commission, (3) the maintenance of the turnpike roadway in a condition that ensures the safety of its users, (4) the fulfillment of the Commission's obligations to its bondholders, and (5) the carrying out of all other matters which by previous practice have been considered germane to the functioning of the Commission. The Vice-Chairman's power to issue these directives can only be countermanded by the vote of at least three Commissioners.

Following the equitable path which motivated our Supreme Court's Order of September 12, 1984 and the extraordinary relief it directed in *Fidelity Bank,* as well as our earlier Opinion and Order of March 8, 1984, we believe that the Commission must function totally in a manner not only consistent with but mandated by the legislature when it granted unique, autonomous powers of turnpike governance to this Commission.[19]

---

[19] The Commission is an entity independent of the Commonwealth, *Camiel v. State Ethics Commission,* 56 Pa. Commonwealth Ct. 518, 425 A.2d 60 (1981), having nevertheless been legislatively created for the purpose of exercising powers deemed to be an es-

338

The legislature in conferring these powers envisioned that the Commission would stand responsibly ready at all times to make the policy decisions required to solve the various needs of the turnpike system as they emerge in our highly mobile society. The ongoing deadlock among the Commission members threatens to impede indefinitely the Commission's discharge of its statutory mandate. We would abdicate our judicial responsibilities were we to sit by and watch the deterioration of our Turnpike System, whose tradition of excellence in concept programming and execution is a national model. The interests of the Commonwealth and the citizens it serves demand the prompt resolution of overdue policy decisions involving short and long term capital projects. The existing uncertainty in the market place which adversely affects the Commission's credit rating tells us that we must resolve the enigma immediately.

Having decided the role of Vice-Chairman Camiel in the daily management of the turnpike system, we must consider what part he will play when a policy decision impasse occurs. In the normal and the traditional conduct of the Commission, the Chairman may not normally unilaterally decide policy issues, since

sential governmental function. *Id.* In furtherance of the Commission's overall purpose of the constructing, operating and maintaining the turnpike system, Section 4 of the Turnpike Act, 36 P.S. §652d, establishes in the Commission the specific authority to (1) acquire, own, lease, operate, and dispose of real and personal property (§4, 36 P.S. §652d), (2) execute contracts necessary to the performance of its general responsibilities (§4, 36 P.S. §652d), (3) purchase easements and rights of way (§5, 36 P.S. §652e), (4) acquire through condemnation easements and rights of ways (§6, 36 P.S. §652f), (5) issue turnpike revenue bonds (§8, 36 P.S. §652h), (6) execute trust indentures to secure revenue bonds (§10, 36 P.S. §652j), (7) regulate tolls charged for the use of the turnpike system (§12, 36 P.S. §6521), (8) issue turnpike revenue refunding bonds (§13, 36 P.S. §652m).

these are for consideration and decision by the Commission in body. Nevertheless, since these vital decisions cannot be delayed by disagreement and impasse, we conclude that in this extraordinary and unique posture the Vice-Chairman must be assigned special extraordinary remedial authority.

So that the Commission may pursue its legislatively-mandated policy functions during the pendency of the current stalemate, we direct that items of policy placed on the Commission's agenda and acted upon by it shall be deemed authorized unless they are *opposed* by the formal vote of at least three Commission members. Should contradictory measures be proposed at any meeting in an attempt to frustrate this interim policy-making process, it is necessary and proper for Vice-Chairman Camiel to responsibly exercise discretionary powers in deciding how the herein-prescribed policy should be executed subject to certain limitations. This authority is derived from Vice-Chairman's current status as the Commission's chief executive officer in charge of executing all actions incidentally flowing from a policy decision. Vice-Chairman Camiel shall (1) exercise this authority on the recommendations of the Commission's staff, (2) support his decision by good and sufficient reason relative to its need, cost, and merit, (3) upon exercising this authority, either convene a special meeting of the Commission at the earliest possible date for consideration thereof or, if such a meeting is not possible, circulate a written text of his decision to the other Commissioners, and (4) read into and make a part of the minutes of the special meetings, or in the absence thereof, circulate to the other Commissioners, the facts considered and the reasons for his decision. The decision on an execution of a policy matter shall be subject to veto only by the vote of at least three Commissioners at a special meeting, or, in the absence

of such a meeting, by the communication of the written objection of at least three Commissioners within seven days of the circulation of Vice-Chairman Camiel's decision, the facts considered by him, and the reasons for his decision.

We emphasize that these extraordinary powers herein granted are based upon the extraordinary and unique requirements of the Pennsylvania Turnpike Commission and are not intended nor do they serve as authority for the conduct of any other Board, Agency, or Commission of this Commonwealth.

## CONCLUSION

As Secretary Larson has failed to establish a clear legal right to the injunction he requests, he is not entitled to such relief. *School District of Pittsburgh v. Zebra*, 15 Pa. Commonwealth Ct. 203, 325 A.2d 330 (1974). Therefore, judgment must be entered in favor of the Commission and Commissioner Camiel as a matter of law. We thus grant the Commission's and Commissioner Camiel's motion for summary judgment.

## ORDER

Upon consideration of the petitioner's and the respondents' cross motions for summary judgment, it is ORDERED that:

1. The petitioner's motion for summary judgment is denied and the respondents' motion for summary judgment is granted.

2. Pending the resolution of the Commission's present impasse, through the seating of a fifth Commissioner or otherwise, Vice-Chairman Camiel is authorized to

(a) unilaterally issue directives necessary to

(1) the continued unimpeded daily operation of the turnpike system,

(2) the payment of monies owing on obligations approved by the Commission,

(3) the maintenance of the turnpike roadway in a condition that ensures the safety of its users,

(4) the fulfillment of the Commission's obligations to its bondholders, and

(5) the effectuation of the construction, financing, and designation of additional highway projects,

(6) the carrying out of all other matters considered germane to the Commission's functioning,

except that a directive may be countermanded by vote of at least three Commissioners, and

(b) upon the Commission's approval of contradictory policy measures, exercise his discretionary powers as chief executive officer to implement the policy measure he deems more appropriate, in accordance with the conditions contained in this Opinion and subject to the effective veto of at least three Commissioners.

In the event a Chairman or new Vice-Chairman is elected prior to the resolution of the current impasse, such person shall inherit all the interim powers and duties contained herein.